RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0157p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BERTHA MAE HUFF; JAMES HAROLD HUFF,

*Plaintiffs-Appellants,*

*v.*

No. 14-5123

CAROL SPAW,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:13-cv-00212—David L. Bunning, District Judge.

Argued: October 7, 2014

Decided and Filed: July 21, 2015

Before: BOGGS and COOK, Circuit Judges; and QUIST, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Aaron A. VanderLaan, ARNZEN MOLLOY, STORM & TURNER, P.S.C., Covington, Kentucky, for Appellants. Jonathan B. Allison, FREKING & BETZ, LLC, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Aaron A. VanderLaan, Mark G. Arnzen, ARNZEN MOLLOY, STORM & TURNER, P.S.C., Covington, Kentucky, for Appellants. Jonathan B. Allison, Randolph H. Freking, FREKING & BETZ, LLC, Cincinnati, Ohio, for Appellee.

_____

[*]The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

1

_____

**OPINION**

_____

BOGGS, Circuit Judge. This case requires us to consider whether a person who listens to and subsequently electronically records a conversation from an inadvertent "pocket-dial" call[1] violates Title III of the Omnibus Crime Control and Safe Street Act of 1968, 18 U.S.C. § 2510 et seq. (Title III). James Huff inadvertently placed a pocket-dial call to Carol Spaw while he was on a business trip in Italy. Spaw stayed on the line for 91 minutes and listened to face-to-face conversations that James Huff had with Larry Savage, James's colleague, and with Bertha Huff, James's wife. Spaw transcribed what she heard and used an iPhone to record a portion of the conversation between James and Bertha Huff (the Huffs). The Huffs brought suit against Spaw for intentionally intercepting their private conversations, in violation of Title III. The district court granted summary judgment for Spaw on the ground that, because James Huff placed the pocket-dial call, the Huffs lacked a reasonable expectation that their conversations would not be intercepted, which is a prerequisite for protection under Title III. This appeal followed. We affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

James Huff was Chairman of the Kenton County, Kentucky, Airport Board (Airport Board), which oversees the Cincinnati/Northern Kentucky International Airport (CVG). In October 2013, he traveled to Bologna, Italy with his wife, Bertha Huff, and with Airport Board Vice Chairman Larry Savage to attend a business conference. Carol Spaw worked at CVG as Senior Executive Assistant to the airport's CEO, Candace McGraw, and as liaison to the Airport Board. Her work responsibilities included making travel arrangements for board members.

After a conference meeting on October 24, James Huff and Savage went on an outdoor balcony in their hotel to speak about CVG personnel matters, including the possibility of

_____

[1]The term "pocket-dial" refers to the accidental placement of a phone call when a person's cellphone "bump[s] against other objects in a purse, briefcase, or pocket." Fed. Commc'n Comm'n, Accidental 911 Calls from Wireless Phones Pose Risk to Public Safety, available at http://www.fcc.gov/guides/accidental-911-calls-wireless-phones (last visited June 30, 2015).

replacing Candace McGraw as CEO. While on the balcony, James Huff tried to call Spaw's personal cellphone using his iPhone to ask her to make dinner reservations for him and Savage. The call did not connect because James misdialed Spaw's number. After this unsuccessful attempt, James placed the iPhone in his suit's breast pocket. Savage then successfully called Spaw's office phone using his personal cellphone and had her make reservations. After this phone call, Savage and Spaw hung up their respective phones.

Soon thereafter, while James Huff spoke with Savage about CVG personnel matters, the iPhone in James's suit pocket placed a pocket-dial call to Spaw's office phone. Spaw answered and could hear James Huff and Savage talking, but she could not understand what they were saying. She said "hello" several times but got no response. Spaw asked her colleague, Nancy Hill, to help decipher what James Huff and Savage were saying. Spaw then put the phone on speaker mode to enhance the volume and said "hello" several more times. Within ninety seconds, Spaw and Hill determined that Huff and Savage were discussing McGraw's employment situation and that the call was not intended for them. Spaw began to take handwritten notes of the conversation and instructed Hill to do the same. Spaw claims that she believed that she heard James Huff and Savage engaged in a discussion to discriminate unlawfully against McGraw and felt that it was her responsibility to record the conversation and report it through appropriate channels. The pocket-dial call lasted approximately 91 minutes,[2] during which Spaw listened continuously.

James Huff and Savage spoke on the hotel balcony about CVG personnel matters for approximately the first 40 minutes of the pocket-dial call. The two board members then left the balcony to attend a meeting in a conference room. Spaw stayed on the line and asked Hill to obtain an iPhone from the CVG IT Department with which she could record the call. The meeting in the conference room ended approximately 70 minutes into the call. James Huff and Savage left the meeting room and walked back to their respective hotel rooms. Along the way, Spaw heard them talking about innocuous subjects such as their children's activities, taking a nap, and evening plans. Approximately 75 minutes into the call, James Huff returned to his hotel

---

[2]According to James Huff's cell phone records, his phone placed a 91-minute call to Spaw's office phone at 3:35 PM in Italy (9:35 AM EST) on October 24, 2013 . However, Carol Spaw testified that the call ended at 11:04, which would indicate a total duration of 89 minutes (9:35 AM to 11:04 AM). On appeal, both parties agree that the call lasted 91 minutes. Appellants' Br. at 7; Appellee's Br. at 10.

room where his wife, Bertha Huff, awaited him. In addition to speaking about personal family matters, James and Bertha Huff discussed the contents of James's earlier conversation with Savage. Spaw used an iPhone obtained from the CVG IT Department to record the final four minutes and 21 seconds of the conversation between the Huffs.

At one point, James Huff noticed that his personal iPhone had an open call with Spaw's office phone. He mistakenly believed that it had been open for only one minute and twenty-nine seconds, when in reality it had been one hour and twenty-nine minutes. He testified that he immediately terminated the call, but cellphone records indicate that the call lasted one hour and thirty-one minutes. This suggests that he may have left the pocket-dial call open for an additional two minutes after realizing what had occurred.

After the call ended, Spaw converted handwritten notes that she and Hill made into a typewritten summary. She also transferred the iPhone recording to a thumb drive, which she gave to a third-party company to enhance the audio quality. She eventually shared the typewritten summary and the enhanced audio recording with other members of the Airport Board.

On December 3, 2013, Bertha and James Huff filed a Verified Complaint alleging that, inter alia, Spaw violated Title III by intentionally intercepting their oral communications, in violation of 18 U.S.C. § 2511(1)(a); disclosing the contents of intercepted oral communications, in violation of 18 U.S.C. § 2511(1)(c); and using the contents of intercepted oral communications, in violation of 18 U.S.C. § 2511(1)(d). The district court granted summary judgment to Spaw on January 24, 2014, holding that Title III does not protect the Huffs' conversations because any expectation that their conversations would not be intercepted was not reasonable under the circumstances. *Huff v. Spaw*, 995 F. Supp. 2d 724, 733–34 (E.D. Ky. 2014).[3] The Huffs now appeal.

---

[3]The district court also ruled that the Huffs' conversation did not qualify for protection under Title III as a wire communication and the Huffs do not dispute this holding. *Huff*, 995 F. Supp. 2d at 734.

## II. JURISDICTION

Because the communications that were intercepted took place outside of the United States, we first consider whether it was proper for the district court to exercise jurisdiction under 28 U.S.C. § 1331. There is a "legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application" unless the "statutory language, context, history, or purpose show the contrary." *Small v. United States*, 544 U.S. 385, 388–89, 391 (2005). There are no such contrary indications with respect to Title III. Courts have repeatedly applied the general "legal presumption" against extraterritorial application to Title III. *See United States v. Peterson*, 812 F.2d 486, 492 (9th Cir. 1987) ("Title III has no extraterritorial force."); *see also United States v. Toscanino*, 500 F.2d 267, 279–80 (2d Cir. 1974).

When determining whether an alleged interception is extraterritorial, and therefore beyond the jurisdiction of federal courts as a question arising under Title III, we do not consider whether the plaintiffs are citizens of the United States, *Stowe v. Devoy*, 588 F.2d 336, 341 n.11 (2d Cir. 1978), or whether the communications traveled through United States telecommunication infrastructure, *United States v. Cotroni*, 527 F.2d 708, 711 (2d Cir. 1975). Instead, we look to "where the interception took place." *Ibid.*; *see also Stowe*, 588 F. 2d at 341 n.12. Title III defines interception as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The relevant location is not where the Huffs' conversations took place, but where Spaw used a device to acquire the contents of those conversations. Because Spaw used her office phone and an iPhone in Covington, Kentucky, there is no extraterritoriality that would bar the application of Title III. Accordingly, the district court properly exercised jurisdiction pursuant to 28 U.S.C. § 1331.

## III. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 565 (6th Cir. 2005). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). When ruling on a summary-judgment motion, a court must draw all reasonable inferences from the evidence in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

### A

Title III makes it unlawful to "intentionally intercept[] . . . any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The act defines "intercept" to mean "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4). Title III further prohibits intentional disclosure or use of "the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of wire, oral, or electronic communication in violation of [Title III]." *Id.* § 2511(1)(c), (d). In addition to criminal penalties, Title III provides injured parties with a private right of action against violators. *Id.* § 2520(a). The Huffs relied upon this authorization of a private right of action to bring their federal claims.

### B

As a threshold question, we consider whether the Huffs' conversations were protected under Title III, which covers only wire, oral, or electronic communication as those terms are defined by the statute. *In re Askin*, 47 F.3d 100, 102–03 (4th Cir. 1995). Title III defines an oral communication for its purposes as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). The language makes clear that Congress did not enact Title III to protect every face-to-face conversation from interception. We have held that a person engages in protected oral communication only if he exhibited "an expectation of privacy that is both subjectively and objectively reasonable." *Dorris v. Absher*, 179 F.3d 420, 425 (6th Cir. 1999). This assessment parallels the reasonable-expectation-of-privacy test articulated by Justice Harlan in *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J.,

concurring).  Other courts have also applied *Katz*'s reasonable-expectation test to assess whether a communication is protected under Title III.  *See Kee v. City of Rowlett*, 247 F.3d 206, 211–12 (5th Cir. 2001); *United States v. Turner*, 209 F.3d 1198, 1200 (10th Cir. 2000); *United States v. McKinnon*, 985 F.2d 525, 527 (11th. Cir. 1993); *United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978).  The statutory history of Title III also supports such an application.  S. Rep. No. 1097, 90th Cong., 2d Sess. (1968), *reprinted* in 1968 U.S.C.C.A.N 2112, 2178.  In articulating his well-known test, Justice Harlan wrote that, in order to demonstrate a reasonable expectation of privacy,

> [t]here is a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation [must] be one that society is prepared to recognize as "reasonable."  Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited.  On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable.

*Katz*, 389 U.S. at 361 (Harlan, J., concurring).

Courts generally refer to *Katz*'s reasonable-expectation test as having a subjective part and an objective part, but the division of labor between these two parts is ill-defined in the Title III context.[4]  Some courts, including ours, limit the subjective part to the issue of whether a person *held an internal belief* in an expectation of privacy from interception.  *See Dorris*, 179 F.3d at 425 ("In the present case, the frank nature of the employees' conversations makes it obvious that they *had* a subjective expectation of privacy.  After all, no reasonable employee

---

[4]The precise contours of the subjective and objective parts of the *Katz* test are somewhat ambiguous in the Fourth Amendment context as well.  The question of whether a person *exhibited* an expectation of privacy without outward conduct (rather than mere belief), or failed to do so because he exposed his activities to outsiders, *Katz*, 389 U.S. at 361 (Harlan, J., concurring), sometimes falls within the subjective part of the test.  *See, e.g., Bond v. United States*, 529 U.S. 334, 338 (2000) (holding that defendant satisfied the subjective-expectation requirement because he, "by his *conduct*, has *exhibited* an actual expectation of privacy") (emphasis added).  Other times, this question falls under the objective part of the reasonable-expectation test.  *See, e.g., California v. Greenwood*, 486 U.S. 35, 39–40 (1988) (holding that defendants lacked an objectively reasonable expectation of privacy because they "exposed their garbage to the public").  On occasion, the issue is analyzed under *both* the subjective and objective parts.  *See, e.g., United States v. Barrows*, 481 F.3d 1246, 1248–49 (10th Cir. 2007) (noting that defendant's "failure to password protect his computer" made the court hesitant "to conclude that [he] harbored a subjective expectation of privacy" and holding that defendant's failure to "take affirmative measures to limit other employee's access" to his computer rendered his expectation of privacy, to the extent that it existed, objectively unreasonable).

would harshly criticize the boss if the employee *thought* that the boss was listening.") (emphases added); *see also McIntyre*, 582 F.2d at 1223 ("There is no question that McGann *had* a subjective expectation of privacy . . . [because] he *believed* that normal conversations in his office could not be overheard, even when the doors to his office were open.") (emphases added). Other courts, including the Tenth Circuit in *Kee*, ask whether plaintiffs "'*exhibited* a subjective expectation of privacy that [their communications] would remain free from governmental [or private] intrusion' and whether they 'took normal precautions to maintain privacy[.]'" 247 F.3d at 213 (first alteration in original) (emphasis added).

Like *Kee*, we also ask whether a person *exhibited* an expectation of privacy, e.g., by taking precaution, but we do so under the objective part of the reasonable-expectation test. The *Dorris* court, for example, held that the plaintiffs' expectation of privacy was objectively reasonable because they "took great care to ensure that their conversations remained private." 179 F.3d at 425. The question of whether that expectation was reasonable under the circumstances also falls under the objective part of the test. The *Dorris* court concluded that, because "the entire office in the present case consisted of a single room that could not be accessed without the employees' knowledge[,] . . . the employees had a reasonable expectation of privacy in their workplace." *Ibid.* This approach effectively bifurcates the objective part of the reasonable-expectation test into two subparts. First, did the employees exhibit a (subjective) expectation of privacy by taking precautions? Second, was that expectation objectively reasonable?

The question of whether a person had an *internal belief* in an expectation of privacy—the only aspect of the subjective part under *Dorris*—is irrelevant because it is subsumed by the exhibited-an-expectation inquiry. If a person lacked an internal belief in privacy, then he would not have exhibited an expectation of privacy and so would fail the reasonable-expectation test. If the person held an internal belief but did not exhibit that belief in an outward manner, he would also fail the reasonable-expectation test due to his inability to satisfy the first objective subpart. Therefore the only relevant inquiries are the two objective subparts: (1) whether a person exhibited an expectation of privacy and (2) whether that expectation was reasonable. These were the same two relevant inquiries for the *Kee* court, except that court categorized the first inquiry

under the subjective part of the reasonable-expectation test.  These two inquires track Title III's statutory text that first, a person "exhibit[ed] an expectation that such communication is not subject to interception" and second, "under circumstance justifying such expectation." 18 U.S.C. § 2510(2).  We therefore bifurcate *Katz*'s reasonable-expectation test—at least in the Title III context—into these two inquiries.

The first part of the test requires more than an internal belief in privacy.  Rather, one must *exhibit* an intention to keep statements private.  A person fails to exhibit an expectation of privacy under the *Katz* test if he *exposes* those statements to the "plain view" of outsiders, 389 U.S. at 361 (Harlan, J., concurring), or if he fails to take to steps to prevent exposure to third parties, *Kee*, 247 F.3d at 216–17 (holding that plaintiffs did not engage in oral communication under Title III because "they failed to present evidence demonstrating any affirmative steps taken to preserve their privacy," and "point to no reasonable safeguards or common-sense precautions taken to preserve their expectation of privacy").  The second part of the *Katz* test is satisfied if the expectation of privacy exhibited by the person is reasonable under the circumstances.  *Katz*, 389 U.S. at 361 (Harlan, J., concurring).  The operative question is whether society is prepared to recognize an exhibited expectation as legitimate.  *Ibid*.  It is essential to consider the two-part *Katz* test with respect to James Huff and Bertha Huff separately.

### i.  James Huff's Reasonable Expectation of Privacy from Interception

The district court found that James Huff "unquestionably did not expect that [his] face-to-face conversations would be intercepted" for two reasons.  *Huff*, 995 F. Supp. 2d at 731.  First, he would not have discussed sensitive, Airport-related matters with Savage and with Bertha Huff if he had known that others might be listening.  *Ibid*.  This establishes only that James Huff likely *intended* his statements to be private, not that he *exhibited* an expectation of privacy.  Second, "[a] significant portion of the intercepted communications took place in two places: a private balcony and a hotel bedroom."  *Ibid*.  While a person generally exhibits an expectation of privacy when he seeks out a private location to speak, if he also exposes his statements to an outsider "no intention to keep them to himself has been exhbited."  *Katz*, 389 U.S. at 361 (Harlan J., concurring).  Because James Huff placed the pocket-dial call to Spaw, he exposed his statements to her and therefore failed to exhibit an expectation of privacy with respect to those statements.

Exposure need not be deliberate and instead can be the inadvertent product of neglect. Under the plain-view doctrine, if a homeowner neglects to cover a window with drapes, he would lose his reasonable expectation of privacy with respect to a viewer looking into the window from outside of his property. *People v. Wright*, 242 N.E. 2d 180, 184 (Ill. 1968); *see also California v. Ciraolo*, 476 U.S. 207, 214–15 (1980) (holding that policemen who observed the inside of a defendant's fenced-in property from a location that was open to the public did not violate the defendant's reasonable expectation of privacy). The doctrine applies to auditory as well as visual information. *United States v. Fisch*, 474 F.2d 1071, 1077 (9th Cir.), *cert. denied,* 412 U.S. 921 (1973) (holding that defendants did not exhibit an expectation of privacy to statements that were "audible to the naked ear" of police in an adjoining hotel room).

The Supreme Court limited the plain-view doctrine in *Kyllo v. United States*, holding that a drug grower did not "expose" heat emanating from his home by failing to take steps to prevent police from using thermal-imaging technology that was not in general public use to observe his in-home activities. 533 U.S. 27, 40 (2001). However, *Kyllo* would not apply where a person inadvertently broadcasts an activity to outsiders through commonly available telecommunications technology that he controls—for instance, if a drug grower advertises his illegal in-home activities to police by inadvertently leaving on his webcam.[5] Similarly, a person exposes his activities and statements, thereby failing to exhibit an expectation of privacy, if he inadvertently shares his activities and statements through neglectful use of a common telecommunication device.

In *United States v. Ganoe*, a law-enforcement agent discovered the defendant's child-pornography files via LimeWire, a peer-to-peer file-sharing program that the defendant had installed on his computer. 538 F.3d 1117 (9th Cir. 2008). The defendant moved to suppress the child-pornography evidence as being the fruit of a warrantless search, in violation of the Fourth Amendment. The Ninth Circuit disagreed, holding that the defendant "failed to *demonstrate* an expectation of privacy that society is prepared to accept as reasonable" because "he opened up his download folder to the world." *Id*. at 1127 (emphasis added). Importantly, LimeWire

---

[5]Nor would a person have a private right of action under Title III against third parties if he inadvertently used a webcam to broadcast his in-home activities to those third parties. *See, e.g.*, AMERICAN PIE (Universal Pictures 1999).

allowed a user to turn off the file-sharing function, but the defendant neglected to do so. The Ninth Circuit concluded that "[t]o argue that Ganoe lacked the technical savvy or good sense to configure LimeWire to prevent access to his pornographic files is like saying that he did not know enough to close his drapes." *Id.* at 1127.

The principle that a person does not exhibit a reasonable expectation of privacy when he knew or should have known that the operation of a device might grant others access to his statements or activities is applicable in the Title III context as well. In *McKamey v. Roach*, the plaintiffs brought a private Title III action against the defendant for intercepting their phone conversations where one plaintiff used a cordless phone. 55 F.3d 1236 (6th Cir. 1995). Because Title III expressly excluded "the radio portion of a cordless telephone communication" from the definition of wire communication at the time,[6] 18 U.S.C. § 2510(1) (1988), the plaintiffs sought to characterize their conversations as oral communications. *Id.* at 1239. We rejected this characterization, reasoning that the plaintiffs could not enjoy a reasonable expectation of privacy in their cordless-phone conversations because "cordless telephone communications are broadcast over the radio waves to all who wish to overhear," and the plaintiffs knew or should have known of this risk because the owner's manual provided an explicit warning. *Id.* at 1239–40.

At his deposition, James Huff admitted that he was aware of the risk of making inadvertent pocket-dial calls and had previously made such calls on his cellphone. A number of simple and well-known measures can prevent pocket-dials from occurring. These include locking the phone, setting up a passcode, and using one of many downloadable applications that prevent pocket-dials calls, *see, e.g.*, Will Verduzco, "Prevent Unwanted Butt Dialing with Smart Pocket Guard," *xdadevelopers*, Apr. 15, 2014, available at http://www.xda-developers.com/android/prevent-unwanted-butt-dialing-with-smart-pocket-guard/ (reviewing a smartphone application designed to prevent pocket-dial calls from occurring) (last visited July 8, 2015). James Huff did not employ any of these measures. He is no different from the person who exposes in-home activities by leaving drapes open or a webcam on and therefore has not exhibited an expectation of privacy. *See Ganoe*, 538 F.3d at 1127. Having determined that

---

[6]In 1994, Congress amended Title III to remove the cordless-phone exemption, and thus made interception of cordless-phone conversations actionable as an interception of wire communication. COMMUNICATIONS ASSISTANCE FOR LAW ENFORCEMENT ACT, Pub. L. No. 103-414, § 202(a), 108 Stat. 4279 (1994).

James Huff failed to exhibit an expectation of privacy, we need not determine whether circumstances justified such an expectation to conclude that his statements do not qualify as oral communications and therefore cannot give rise to liability under Title III.

The Huffs warn that, if we do not recognize James Huff's reasonable expectation of privacy in this case, we would deprive all cellphone-carrying Americans of their reasonable expectations of privacy in their conversations. Appellant's Brief at 22. We disagree. Not recognizing James Huff's expectation would do no more injury to cellphone users' privacy interests than the injury that the plain-view doctrine inflicts upon homeowners with windows or webcams. A homeowner with an uncovered window or a broadcasting webcam lacks a reasonable expectation of privacy with respect only to viewers looking through the window that he neglected to cover or receiving signals from the webcam he left on. He would retain a reasonable expectation of privacy in his home with respect to other means of observation, for example thermal-imagery devices. *Kyllo*, 533 U.S. at 40. Similarly, James Huff retained an expectation of privacy from interception by non-pocket-dial means, such as by a hidden recording device or by someone covertly causing his cellphone to transmit his statements to an eavesdropper.[7] *See McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 753 (7th Cir. 2010) (holding that a defendant who secretly turns on a plaintiff's dictaphone to record and acquire the plaintiff's conversation would be liable under Title III). James Huff lacked a reasonable expectation of privacy in his statements only to the extent that a third-party gained access to those statements through a pocket-dial call that *he* placed. In sum, a person who knowingly operates a device that is capable of inadvertently exposing his conversations to third-party listeners and fails to take simple precautions to prevent such exposure does not have a reasonable expectation of privacy with respect to statements that are exposed to an outsider by the inadvertent operation of that device.

### ii. Bertha Huff's Reasonable Expectation of Privacy from Interception

Bertha Huff knew that her husband owned a cellphone and that cellphones were capable of inadvertently transmitting conversations to third-party listeners via pocket-dial calls. The

---

[7]*See* Declan McCullagh and Anne Broach, *FBI Taps Cell Phone Mic As Eavesdropping Tool*, CNET NEWS, Dec. 1, 2006, available at http://news.cnet.com/FBI-taps-cell-phone-mic-as-eavesdropping-tool/2100-1029_3-6140191.html (last visited June 30, 2015).

district court held that she lacked a reasonable expectation of privacy in her face-to-face conversation with her husband in their hotel room on the basis of this awareness. *Huff*, 995 F. Supp. 2d at 734. We disagree with this conclusion because speaking to a person who may carry a device capable of intercepting one's statements does not constitute a waiver of the expectation of privacy in those statements.

In addition to placing pocket-dial calls, a cellphone can also be used directly and purposefully to intercept face-to-face conversations, for example, by surreptitiously recording or transmitting them. *See, e.g.*, IPHONE USER GUIDE 133 (2014) (instructing the owner on the use of the recording function). If Bertha waived her reasonable expectation of privacy from pocket-dials by speaking to a person who she knew to carry a pocket-dial-capable device, she would also waive her reasonable expectation of privacy from recordings and transmissions by speaking with anyone carrying a recording-capable or transmission-capable device, i.e., any modern cellphone. The district court's holding would logically result in the loss of a reasonable expectation of privacy in face-to-face conversations where one party is aware that a participant in the conversation may have a modern cellphone. As nearly every participant in a conversation is a potential cellphone carrier,[8] such a conclusion would dramatically undermine the protection that Title III grants to oral communication. It would also mean that, had Spaw and James Huff conspired for James to deliberately turn on his phone and transmit his conversation with Bertha Huff for Spaw to hear and share with others, neither James nor Spaw would have violated Title III because no "oral communication" was intercepted. But the law does not support this conclusion.

First, we consider whether Bertha Huff exhibited an expectation of privacy in the statements she made in her hotel room. Having a conversation in one's home generally exhibits an expectation of privacy, *Katz*, 389 U.S. at 361 (Harlan J., concurring), and hotel rooms are treated as homes for privacy purposes, *Minnesota v. Olsen*, 495 U.S. 91, 98 (1990). Therefore, Bertha Huff exhibited an expectation of privacy in statements she made to her husband in the hotel room, unless she exposed those statements to an outsider as her husband did. For most of

---

[8]As of 2014, approximately 90% of U.S. adults own a cellphone, and 58% of U.S. adults own a smartphone. Pew Research Center Survey, available at http://www.pewinternet.org/data-trend/mobile/cell-phone-and-smartphone-ownership-demographics/ (last visited on June 30, 2015).

the Huffs' approximately 15-minute conversation in the hotel room, Bertha Huff exposed her statements only to her husband, who in turn inadvertently caused some of those statements to be intercepted by Spaw. James Huff discovered that he had made a pocket-dial approximately 89 minutes into a 91-minute call and told his wife that "my phone is on." To the extent that Bertha Huff understood this statement to mean that James's phone was still connected to another phone, she would have exposed her statements in the apparent final two minutes of the call to any outsider on the other end of the call and therefore would not have enjoyed a reasonable expectation of privacy with respect to only those statements. As to statements Bertha Huff made prior to this two-minute window, her awareness that her husband may have been carrying an interception-capable device—i.e., an iPhone—did not displace her expectation of privacy.

We held in *Boddie v. American Broadcasting Company Inc.* that someone who knowingly converses with a person who may be carrying an interception-capable device can nonetheless enjoy a reasonable expectation of privacy from interception. 731 F.2d 333, 338–39 (6th Cir. 1984). Boddie agreed to an interview with a TV reporter but refused to give consent to being recorded. *Id.* at 335. The reporter nonetheless secretly recorded the conversation, and Boddie sued under Title III. *Ibid.* In reversing the district court's summary judgment for the defendant, we held that, although "Boddie was aware that she was speaking to a reporter from ABC," "it remain[ed] an issue of fact for the jury whether Boddie had an expectation that the interview was not being recorded and whether that expectation was justified under the circumstances." *Id.* at 338–39. In reaching this conclusion, we noted that there are "some circumstances where a person does not have an expectation of *total* privacy, but still would be protected by [Title III] because he was not aware of the specific nature of another's invasion of his privacy." *Id.* at 339 n.5 (emphasis added). Similarly, we do not require Bertha Huff to exhibit an expectation of total privacy—e.g., by searching her husband and forcing him to turn off his phone—in order to be protected under Title III. Because Bertha Huff made statements in the privacy of her hotel room, was not responsible for exposing those statements to an outside audience, and was (until perhaps the final two minutes) unaware of the exposure, she exhibited an expectation of privacy.

Turning to the question of whether circumstances justified her expectation, the Supreme Court has long held that society is prepared to recognize as legitimate an expectation of privacy in statements that a person made under circumstances similar to Bertha Huff's. *Katz*, 389 U.S. at 359 (finding a Fourth Amendment violation in the attachment of an eavesdropping device to a public telephone booth). Therefore, Bertha's Huff's expectation of privacy from interception was justified under the circumstances.

Having found that Bertha Huff exhibited an expectation of privacy in her statements that was reasonable under the circumstances, we reverse the district court's holding that she did not engage in oral communications. This does not necessarily mean that Spaw is liable, because Title III imposes liability only when a person "intentionally" uses a "device" to intercept oral communications. We leave to the district court to consider on remand whether any of Spaw's actions, including (1) answering the phone, (2) turning up the volume, (3) transcribing notes, and (4) making an electronic recording, constituted an "intentional use of a device" to intercept Bertha Huff's oral communications. Additionally, if James Huff had noticed that his phone was connected to an outside line two minutes before he ended the call, and Bertha Huff understood this, then Bertha would not be protected by Title III with respect to those final minutes of her conversation.

## C

Spaw relies on *Williams v. State*, 507 P.2d. 1339 (Okla. Crim. App. 1973), to argue that, even if some of the conversation that she overheard constituted oral communication, she is not liable because her conduct does not qualify as "interception" under Title III. Appellee's Br. at 23–25. In *Williams*, a motel manager answered a phone call from a motel room and heard a "very loud disturbance in the room including cussing fighting and calling each other names." *Id.* at 1340 (internal quotation marks omitted). The manager made a tape recording of the conversation, which was introduced as evidence at the defendant's trial for the murder of the room's occupant. *Ibid.* The defendant sought to exclude the recording as an unlawful interception under Title III, and the *Williams* court held that "the defendant has not shown that the tape recording in question was the result of an intercept . . . [because] there was no tap on the line or interference with the normal telephone lines." *Id.* at 1341 (internal quotation marks

omitted).  Spaw argues that she "did not mechanically or physically manipulate the line, so no interception occurred." Appellee's Br. at 25.  We find this argument unconvincing for two reasons.

First, the *Williams* court relied upon a misreading of *Rathbun v. United States*, 355 U.S. 107 (1957), by *State v. Vizzini*, 278 A.2d 235, 237 (N.J. Super. Ct. App. Div. 1971), to conclude that interference is a prerequisite for interception.  In *Rathbun*, the Supreme Court considered the meaning of "intercept" under a former provision of the Federal Communications Act of 1934, 47 U.S.C. § 605 ("No person not being authorized by the sender shall intercept any communication and divulge or publish . . . such intercepted communications to any person."), and held that no "interception" had occurred when one of two parties to a telephone conversation permitted a third party to surreptitiously listen on an extension line.  355 U.S. at 111.  The Court reasoned that "[e]ach party to a telephone conversation takes the risk that the other party may have an extension telephone and may allow another to hear the conversation." *Ibid.*  The *Vizzini* court interpreted this to mean that, "[s]o long as the physical integrity of the established line is not violated, there is no interception."  278 A.2d at 237.  *Williams* adopted this interpretation, 507 P.2d. at 1341–42, and in doing so, conflated a sufficient condition with a necessary one.  While third-party interference with the phone line was one way to intercept communications, the use of an unaltered phone line without the consent of either party would also qualify as interception. *Laughlin v. United States*, 344 F. 2d 187, 191–92 (D.C. Cir. 1965) (holding that a § 605 interception had occurred when a party's consent to third-party eavesdropping through an unaltered extension line was obtained through coercion).  Therefore, non-interference with a phone line does not, by itself, prevent an instance of phone-based eavesdropping from qualifying as an interception if the eavesdropping occurred without the consent of at least one party to that conversation, as is the case with the Huffs.

Second, the *Vizzini* court mistakenly treated § 605 interception as being interchangeable with Title III interception, 278 A.2d at 237, and *Williams* adopted this treatment, 507 P.2d at 1341.  Title III defines interception more broadly than did § 605.[9]  Even if the Supreme Court

---

[9]For example, the two statutes differ as to whether interception is possible where one party consents.  In *Rathbun*, the Supreme Court held that no § 605 interception occurs where a party consents to eavesdropping, 355 U.S. at 111.  However, 18 U.S.C. § 2511(2)(c) makes clear that Title III interception can occur despite party

had held that § 605 interception requires interference, we could not rely on that holding to define the meaning of "interception" under a different statute. We must instead look to Title III's text, which undermines Spaw's position because the statutory definition for interception contains no reference to an interference requirement. 18 U.S.C. § 2510(4). The statute goes on to state that it is unlawful to intentionally intercept oral communications under a variety of conditions, including through the use of a "device [that] transmits communication by radio, *or* interferes with the transmission of such communication." *Id.* § 2511(1)(b)(ii) (emphasis added). The disjunctive use of "or" indicates that Title III contemplates using a radio device that does not interfere with radio transmissions to unlawfully intercept oral communications. Case law also contradicts Spaw's interference requirement. In *Boddie*, we held that covertly recording a face-to-face conversation could be the basis for unlawful interception under Title III, 731 F.2d at 339, and the Seventh Circuit reached the same conclusion in *McCann*, 622 F.3d at 752–53. In neither case did the defendant "interfere" with a line of communication.

Because Spaw cites non-binding and unpersuasive case law to support a conclusion that is inconsistent with statutory text and binding case law, we reject her argument that her conduct did not qualify as interception because she did not interfere with the phone line.

## V. CONCLUSION

James Huff's statements do not qualify as oral communications for Title III purposes because he exposed them to Spaw when he pocket-dialed her, but Bertha Huff's statements do qualify because she cannot be held responsible for her husband's pocket-dial. While Spaw intercepted Bertha Huff's oral communications, the question remains as to whether she did so intentionally through use of a device. Accordingly, we AFFIRM the district court's judgment as to James Huff, REVERSE the district court's judgment as to Bertha Huff, and REMAND for further consideration consistent with this opinion.

---

consent because that section provides that "[i]t shall not be unlawful for a person acting under color of law to intercept a wire, oral or electronic communication, where . . . one of the parties to the communication has *given prior consent* to such interception." (Emphasis added).