[Cite as *State v. Jones*, 2016-Ohio-67.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | | CASE NO. CA2015-05-014 |
| Plaintiff-Appellee, | : | |
| | | O P I N I O N |
| | : | 1/11/2016 |
| - vs - | : | |
| | : | |
| KRISTOPHER A. JONES, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. CRI2014-2107

Jessica A. Little, Brown County Prosecuting Attorney, Mary McMullen, 510 East State Street, Suite 2, Georgetown, Ohio 45121, for plaintiff-appellee

Kristopher A. Jones, 121 Heritage Boulevard, Mt. Orab, Ohio 45154, defendant-appellant, pro se

**S. POWELL, P.J.**

{¶ 1} Defendant-appellant, Kristopher A. Jones, appeals pro se from his conviction in the Brown County Court of Common Pleas after a jury found him guilty of obstructing official business. For the reasons outlined below, we affirm.

{¶ 2} On May 30, 2014, the Brown County Grand Jury returned an indictment charging Jones with obstructing official business in violation of R.C. 2921.31(A), a fifth-

degree felony. The charge stemmed from allegations that on the morning of April 20, 2014, Jones, without privilege to do so, purposely prevented, obstructed, or delayed Officer Michael Dearing and Patrolman Justin Conley with the Mt. Orab Police Department from investigating an alleged accidental 9-1-1 "pocket call" originating from the Joneses' home.[1] It was further alleged that Jones created a risk of physical harm to one or both of the responding officers once they arrived at the scene. It is undisputed that officers with the Mt. Orab Police Department are trained to respond to every 9-1-1 call regardless of whether the call is believed to be merely an accidental "pocket call."

{¶ 3} On July 17, 2014, Jones filed a motion to suppress with the trial court arguing Officer Dearing and Patrolman Conley were not lawfully on his property and could not legally enter his home, thereby requiring the dismissal of the obstructing official business charge against him. However, after holding a hearing on the matter, the trial court denied Jones' motion. In so holding, the trial court stated, in pertinent part:

> The Court finds that the officers were justified in responding to the Jones residence as a result of a dispatch that indicated a possible 911 "pocket call" and that they were further justified in entering the residence without a warrant to ensure that no one in the premises was injured or in need of immediate assistance. The Court notes that nothing was "seized" as a result of the entry.

{¶ 4} The matter then proceeded to a three-day jury trial that ultimately concluded on May 1, 2015. Following deliberations, the jury found Jones not guilty of the originally charged fifth-degree felony obstructing official business offense, but guilty of lesser included second-degree misdemeanor obstructing official business offense. The trial court then sentenced Jones to 60 days in jail, all of which was suspended, and ordered Jones to serve one year of

---

1. The term "pocket call," also known as a "pocket dial" or an "open line call," refers to the accidental placement of a telephone call when a person's cellphone bumps against other objects in a purse, briefcase, or pocket. *Huff v. Spaw*, 794 F.3d 543, 545, fn. 1 (6th Cir.2015).

community control.  Jones now appeals from his conviction, raising two assignments of error for review.

{¶ 5}   Assignment of Error No. 1:

{¶ 6}   THE TRIAL COURT JURY (sic) ERRED BY DENYING APPELLANTS (sic) MOTION TO SUPPRESS.

{¶ 7}   In his first assignment of error, Jones argues the trial court erred by denying his motion to suppress.  We disagree.

{¶ 8}   Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact.  *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 15, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.  When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence in order to resolve factual questions and evaluate witness credibility.  *State v. Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 8.  In turn, when reviewing the denial of a motion to suppress, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.  *State v. Durham*, 12th Dist. Warren No. CA2013-03-023, 2013-Ohio-4764, ¶ 14.  "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard."  *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12.

{¶ 9}   Jones argues the trial court erred by denying his motion to suppress because Officer Dearing and Patrolman Conley had "no duty to provide any service to any individuals" at his home that would justify their coming onto his property to investigate an accidental "pocket call." Jones also argues the trial court erred by denying his motion to suppress since both he and his wife, Katrina, requested Officer Dearing and Patrolman Conley to obtain a

search warrant if they wished to come onto their property. According to Jones, "[a]ll actions beyond the moment of exercising this right [under the Fourth Amendment] should be void, including the officers (sic) claim of having official business." These arguments lack merit.

{¶ 10} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution protect individuals from unreasonable governmental searches and seizures. *State v. Grant*, 12th Dist. Preble No. CA2014-12-014, 2015-Ohio-2464, ¶ 13. Generally, searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507 (1967). Exigent circumstances are one of those well-established exceptions to the Fourth Amendment warrant requirement. *Mincey v. Arizona*, 437 U.S. 385, 393-394, 98 S.Ct. 2408 (1978). This includes situations where there is a "need to protect or preserve life or avoid serious injury." *Id.* at 392. Therefore, "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if doing so would gravely endanger their lives or the lives of others." *Columbus v. Montgomery*, 10th Dist. Franklin No. 09AP-537, 2011-Ohio-1332, ¶ 39.

{¶ 11} Although not specifically addressing an alleged accidental "pocket call," the Third District Court of Appeals addressed a similar situation in regards to a 9-1-1 hang-up call in *State v. Myers*, 3d Dist. Marion Nos. 9-02-65 and 9-02-66, 2003-Ohio-2936. As stated by the Third District in *Myers*:

> [W]e find these types of calls to inherently be emergencies. In fact, the emergency of these situations only ceases once the emergency responder is able to ascertain whether someone is in need of aid. Once the responder discovers that no emergency exists, there is no need to further investigate. *However, at times, this discovery can only be made by gaining entrance to the location from which the call was placed.* The mere absence of sounds is not always a sufficient basis to determine whether someone in the home needs immediate aid, especially when

other information exists that would lead one to reasonably believe that someone is inside the home. The person in need of aid could be unconscious or otherwise debilitated. In addition, there may be sounds of distress within the home but which are inaudible to those on the outside of the home.

(Emphasis added.) *Id.* at ¶ 12.

{¶ 12} The Eighth District Court of Appeals has also determined that 9-1-1 hang-up calls provide sufficient exigent circumstances to allow police officers to make a warrantless entry into a home. *Lakewood v. Simpson*, 8th Dist. Cuyahoga No. 80383, 2002-Ohio-4086, ¶ 15. The Second District Court of Appeals has also determined that a "hang-up 9-1-1 call creates a circumstance where a reasonable investigation can be made." *State v. Hunter*, 2d Dist. Montgomery No. 24350, 2011-Ohio-6321, ¶ 18. The Second District has even found officers had lawfully entered an apartment to investigate a 9-1-1 call even though the caller had placed a second 9-1-1 call to report that there was no longer a need for assistance as the "situation had been diffused." *State v. Corbett*, 2d Dist. Montgomery No. 18015, 2000 WL 282302, * 2 (Mar. 17, 2000).

{¶ 13} In light of the foregoing, and based on the facts and circumstances here, we conclude, as did the trial court before us, that exigent circumstances existed that placed a duty on Officer Dearing and Patrolman Conley to fully investigate the alleged accidental 9-1-1 "pocket call" to determine whether an emergency actually existed at the Joneses' property. This included briefly entering the Joneses' home and speaking with the Joneses' three children to ensure that they were not in danger or in need of emergency assistance. In so holding, we note that the exigency of the situation did not vanish simply because Jones and his wife told dispatch and the responding officers that they were not in need of emergency assistance, nor did the exigency cease once they requested the officers to obtain a search warrant. The right to privacy, while fundamental and personal in nature, is not absolute and must yield when required by public necessity. *State v. Williams*, 88 Ohio St.3d 513, 525-526

(2000). Jones' claim otherwise is simply incorrect.

{¶ 14} Moreover, although it should generally go without saying, "logic requires the conclusion that if police have a duty to enter a home to ascertain if emergency assistance is needed, that duty would be meaningless if someone is privileged to resist that entry." *State v. May*, 4th Dist. Highland No. 06CA10, 2007-Ohio-1428, ¶ 14. This is particularly true here considering the officers' testimony at the suppression hearing that indicated Jones was breathing heavily, sweating, irate, and agitated upon their arrival, with Jones' wife also being described as belligerent, very aggressive and extremely agitated. According to Officer Dearing, the Joneses' "odd" reaction caused him to believe something was truly amiss since it was "just not normal behavior[.]" Patrolman Conley further testified that the Joneses' demeanor and aggressiveness towards them was not indicative of the normal accidental 9-1-1 call. Therefore, because the officers were justified in their actions by investigating the matter fully to determine whether an emergency actually existed, we find no error in the trial court's decision to deny Jones' motion to suppress. Accordingly, Jones' first assignment of error is overruled.

{¶ 15} Assignment of Error No. 2:

{¶ 16} THE EVIDENCE AGAINST DEFENDANT-APPELLANT WAS INSUFFICIENT TO SUPPORT A CONVICTION BEYOND A REASONABLE DOUBT AND/OR MANIFEST WEIGHT OF THE EVIDENCE DOES NOT SUPPORT A CONVICTION BEYOND A REASONABLE DOUBT AND THEREFORE DEFENDANT-APPELLANT SHOULD HAVE BEEN ACQUITTED OF ALL CHARGES AGAINST HIM.

{¶ 17} In his second assignment of error, Jones argues his conviction for obstructing official business must be reversed because it was not supported by sufficient evidence and was against the manifest weight of the evidence. We again disagree.

{¶ 18} "The legal concepts of sufficiency of the evidence and weight of the evidence

- 6 -

are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1987). However, although the two concepts are different, it is now well-established that finding a conviction is supported by the manifest weight of the evidence is also dispositive of the issue of sufficiency. *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19, citing *State v. Church*, 12th Dist. Butler No. CA2011-04-070, 2012-Ohio-3877, ¶ 10. Therefore, "[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." *State v. Hart*, 12th Dist. Brown No. CA2011-03-008, 2012-Ohio-1896, ¶ 43.

{¶ 19} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34. However, while appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, "these issues are primarily matters for the trier of fact to decide." *State v. Walker*, 12th Dist. Butler No. CA2006-04-085, 2007-Ohio-911, ¶ 26. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

{¶ 20} As noted above, Jones was convicted of obstructing official business in

- 7 -

violation of R.C. 2921.31(A), a second-degree misdemeanor, which provides, "[n]o person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." The offense of obstructing official business generally requires "the doing of some affirmative act by a defendant." *State v. King*, 3d Dist. Marion No. 9-06-18, 2007-Ohio-335, ¶ 58, citing *State v. Muldrow*, 10 Ohio Misc.2d 11 (M.C.1983). However, "failing to act may still constitute obstruction of official business in certain circumstances." *State v. Florence*, 12th Dist. Butler No. CA2013-05-070, 2014-Ohio-167, ¶ 30. Thus, "the proper focus in a prosecution for obstructing official business is on the defendant's conduct, verbal or physical, and its effect on the public official's ability to perform his lawful duties." *State v. Standifer*, 12th Dist. Warren No. CA2011-07-071, 2012-Ohio-3132, ¶ 28.

{¶ 21} At trial, Officer Dearing testified that he was dispatched to the Joneses' property on the morning of April 20, 2014 after a 9-1-1 operator with the Brown County Communication Center received a "911 open line" call originating from a cell phone traced to the Joneses' home. It is undisputed that Jones' wife told the 9-1-1 operator who returned the 9-1-1 call that there was no emergency and that the call was merely an accidental "pocket call." However, as noted above, it is also undisputed that officers with the Mt. Orab Police Department are trained to respond to every 9-1-1 call regardless of whether the call is believed to be merely an accidental "pocket call." As Officer Dearing testified, "[i]t's our policy at the Mt. Orab Police Department [to respond to every 9-1-1- call] – I mean, it's why 911 was created was it's an emergency situation, if you dial it, you should expect that the police are gonna show up."

{¶ 22} Upon arriving at the Joneses' property, Officer Dearing testified Jones' wife exited the garage and approached his cruiser in a very angry and agitated state. Officer

Dearing then testified she began yelling at him to "get off the property. Unless I have a warrant, I need to get off the property." In response, Officer Dearing testified he tried to explain that he had been dispatched to the scene in order to investigate the alleged accidental 9-1-1 "pocket call" to make sure everybody was safe and not in need of emergency assistance. Jones' wife, however, "had no interest in – she didn't care why [he] was there. She wanted [him] off the property." During this time, Officer Dearing testified Jones was standing in the garage, breathing heavily and sweating, appearing "agitated and aggravated that [he] was there."

{¶ 23} Officer Dearing then testified he got out of his cruiser and entered the garage where he smelled the odor of burnt marijuana. However, merely wanting to ensure that everybody was safe, Officer Dearing testified he did not investigate the smell of marijuana any further. Rather, Officer Dearing testified he simply asked the Joneses for their identification. To this, Officer Dearing testified "[t]hey both refused, tell me they don't have to give it to me. That I need a warrant to be on their property. I tried to advise 'em, multiple times, that I'm here, because there's a 911 call."

{¶ 24} Eventually agreeing to provide him with her driver's license, Officer Dearing testified Jones' wife opened the garage door leading inside when he saw the Joneses' three children within the house. Officer Dearing then testified, in pertinent part, as follows:

> A: * * * So, as soon as I observed that there was children in the residence, I advised her I needed to see the children. She advised, multiple times, that I wasn't gonna see the children. I said, "I just need to make sure that they're okay." She said she agrees. And, then, she brings the children out – out into the garage.
>
> Q: What happened once the children got into the garage?
>
> A: As soon as the children come out in the garage, you know, I have to take myself back a little bit, because, you know, it's a very agitated and escalated situation. I bring my voice down, talk softly to the children. As soon as I begin to talk to 'em. The

> Defendant's wife yells at the children and yells at me that I will not speak to them, and they won't speak to me and rushes 'em back into the residence and closes the door.

{¶ 25} After the children went back inside, Officer Dearing testified Patrolman Conley arrived at the scene. However, when Jones' wife also refused to provide him with her identification, Patrolman Conley placed her in handcuffs and escorted her to his cruiser. During this time, Jones' wife was belligerent, screaming curse words and using profanity. Once Jones' wife was placed into Patrolman Conley's cruiser, Officer Dearing testified he spoke with Jones and informed him that he needed to step inside the house and speak to the children, to which Jones responded:

> And, at that point in time, as soon as I said that, the Defendant turned his body, in what we call a fighting stance, [balanced] himself, his eyes locked on to – locked straight on my forehead, on my face, and his hands balled into a fist, and instantly the right arm started to move in a upward/backward motion. And at that point in time, there was no doubt in my mind that he was gonna hit me. He had every intention of hitting me.

{¶ 26} Upon seeing Jones take a fighting stance, Officer Dearing testified he grabbed Jones' right arm and told him to place his hands behind his back. However, instead of complying with Officer Dearing's orders, Jones turned and attempted to exit the garage, thus prompting Patrolman Conley to grab Jones' left arm. Officer Dearing and Patrolman Conley then took Jones to the ground and placed him in handcuffs. When asked if he observed any injuries to Jones after taking him to the ground, Officer Dearing testified he did not observe any injuries to Jones, nor did Jones ever complain of any injuries.

{¶ 27} After Jones was subdued, Officer Dearing testified he and Patrolman Conley picked Jones up off the garage floor and sat him on the front bumper of a nearby vehicle. Officer Dearing then testified he went inside and spoke to the Joneses' three children, all of whom stated they were not injured and were not in need emergency assistance. When asked how long he was inside the Joneses' house, Officer Dearing testified "[a] minute, tops."

Upon learning the children were safe, Officer Dearing exited the house and issued the Joneses each a summons charging them both with obstructing official business. The charge against Jones was later dismissed and refiled in the Brown County Municipal Court prior to it being submitted to the Brown County Grand Jury.

{¶ 28} Patrolman Conley also testified at trial. Patrolman Conley testified that he was also dispatched to the Joneses' property following a report of a 9-1-1 "hang up." Patrolman Conley testified that once he arrived at the scene he saw the Joneses being "very verbal" with Officer Dearing. Patrolman Conley then testified:

> As I walked up, I looked at Off. Dearing and Off. Dearing explained to me that they were being uncooperative, and that he believed something else was going on, at that point in time. They were yelling at Off. Dearing, and I walked over and asked the Defendant's wife for her name and date of birth. Officer Dearing had told me that they refused to identify themselves. I asked for her name and date of birth and asked what was going on. She refused to give me her name and date of birth.
>
> At that point, I had decided to separate the suspect, and I told her to place her hands behind her back because of the fact that she was being belligerent and for her safety and my safety, we decided to separate them and – and try to have the situation * * * deescalate, and I put her in handcuffs.

After putting Jones' wife in his cruiser, Patrolman Conley testified she informed him that "they had a severe hatred and mistrust for law enforcement." Patrolman Conley then went back to the garage where Jones and Officer Dearing were talking.

{¶ 29} Continuing, Patrolman Conley then testified he heard Officer Dearing tell Jones that he wanted to go inside to check on the children to make sure they were safe. To this, Patrolman Conley testified Jones gave off several "indicators of pre-attack" by clinching his teeth, taking a rigid stance, and "target glancing." Patrolman Conley then testified:

> At that point in time, as I said, he was – he was showing several pre-attack indicators. As far as the rigidity, in his muscles, clinching his teeth, very argumentative with Off. Dearing, and he had a slower blink rate than normal. He was just staring at Off.

Dearing's face. And Off. Dearing tried to tell him that we were there, just to make sure everyone was okay, and that he was gonna check on the kids. And, when he told him, we'd – you know, we were gonna check and make sure the kids were okay, he said, "Not without a warrant," and at that point in time, he took a fighting stance, to where his leg dropped back, and he drew his hands into a fist and began to raise them up, from where he had tensed up.

And, as soon as that started to occur, Off. Dearing told him, "You need to put your hands behind your back." And took ahold of one of his arms. He turned, refused to put his hands behind his back, and attempted to exit the garage. And, Off. Dearing was telling him, "No, stop." And I – I walked over and – and grabbed a hold of his other arm. And, then, we used a balance displacement technique to lay him down on the ground and place him in handcuffs.

Patrolman Conley then testified he and Officer Dearing picked Jones up off the garage floor and leaned him against a nearby vehicle. Similar to Officer Dearing, Patrolman Conley did not observe any injuries to Jones. The situation then calmed to the point where both Jones and his wife were unhandcuffed and provided with a summons charging them with obstructing official business.

{¶ 30} Jones' wife, Katrina, testified in Jones' defense. Katrina testified that she was checking her e-mail on the morning of April 20, 2014 when she received a phone call on her cell phone from a 9-1-1 operator with the Brown County Communication Center. However, because there was allegedly no emergency, Katrina testified that she told the 9-1-1 operator that the call was simply an accident. Katrina then testified that she and Jones went into the garage waiting for the police to arrive. Thereafter, when Officer Dearing pulled into the driveway a short time later, Katrina testified she "approached him and told him that [she] had already talked to a dispatch personnel and told her that there had been nothing going on, and there was nothing further to investigate." Katrina then testified as follows:

A: He approached me and said – asked me how I was doing, and I informed him that he didn't need to be there, because I had already spoke to dispatch. It had –

Q: How did he respond to that?

A: He was upset. He tried to – in my opinion, he bullied me into trying to allow him to enter my home to further invest[igate] that he wanted me to give him all this information that I was not willing to give.

Q: With the information that you're talking about, is what type of information?

A: He – he had asked for my identification. I told him that it was in my house, that I didn't have it on me. He wanted to know how many kids were in there – who was in the house. And I told him that our three children were. He said that he needed to speak with them, and I was not allowing them to speak with my children, because they are all minors.

Q: Well, how did Off. Dearing respond to your statement?

A: He was visibly upset. He continued to escalate the conversation and get louder with me and upset. And, he said that he was required, by his duties, to go into our house.

Katrina further testified that she told Officer Dearing that if he wanted to go into her house that he needed to get a warrant.

{¶ 31} Continuing, Katrina testified she then brought her children out into the garage so that Officer Dearing and Patrolman Conley could "visibly see the children," but that they were not permitted to question them. When asked to explain why Officer Dearing and Patrolman Conley were not to question her children, Katrina testified that they were minors and did not need to "have their information put into the court system, unless they have [done] something wrong, which they had not." Nevertheless, when Officer Dearing spoke to the children against her wishes, Katrina testified she told her children to go back inside when she was immediately placed in handcuffs.

{¶ 32} After being placed in handcuffs, Katrina testified Patrolman Conley told her she was being arrested for abusing the 9-1-1 system and that child protective services would soon be back for her children. Katrina then testified that she watched from the back of the

- 13 -

cruiser as Officer Dearing and Patrolman Conley approached her husband "very rapidly, and throw him to the ground." According to Katrina, this caused her husband to suffer injuries to his knee and to his shoulder. Katrina also testified that she believed Officer Dearing only wanted to go into her house because he was "planning to put marijuana in [her] home."

{¶ 33} After a thorough review of the record, we find Jones' conviction for obstructing official business was supported by sufficient evidence and not against the manifest weight of the evidence. Again, the evidence established that Jones prevented, obstructed, or delayed Officer Dearing and Patrolman Conley in the performance of their official duties to fully investigating the alleged accidental 9-1-1 "pocket call" originating from the Joneses' home to determine whether an emergency actually existed on the Joneses' property. Based on the facts and circumstances, this included briefly entering the Joneses' home and speaking with the Joneses' three children to ensure that they were not in danger or in need of emergency assistance.

{¶ 34} As Officer Dearing specifically testified, had Jones not hampered him with the performance of his duties, "in five or 10 minutes I could have spoke to the Defendant. The Defendant's wife spoke to the children, made sure everybody was okay, got their information, and cleared the scene." "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." *State v. Bromagen*, 12th Dist. Clermont No. CA2005-09-087, 2006-Ohio-4429, ¶ 38. Therefore, because we find this is not one of those extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal, Jones' second assignment of error is overruled.

{¶ 35} Judgment affirmed.

RINGLAND and HENDRICKSON, JJ., concur.