FILED IN
COURT OF CRIMINAL APPEALS

December 22, 2015

ABEL ACOSTA, CLERK

PD-0984-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/22/2015 8:27:10 AM
Accepted 12/22/2015 9:23:38 AM
ABEL ACOSTA
CLERK

No. PD-0984-15

# IN THE COURT OF CRIMINAL APPEALS

## OF THE STATE OF TEXAS

WENDEE LONG, Appellant

v.

THE STATE OF TEXAS, Appellee

Appeal from Denton County

\*   \*   \*   \*   \*

**STATE'S BRIEF ON THE MERITS**

\*   \*   \*   \*   \*

LISA C. McMINN
State Prosecuting Attorney
Bar I.D. No.13803300

JOHN R. MESSINGER
Assistant State Prosecuting Attorney
Bar I.D. No. 24053705

P.O. Box 13046
Austin, Texas 78711
information@spa.texas.gov
512/463-1660 (Telephone)
512/463-5724 (Fax)

**ORAL ARGUMENT REQUESTED**

## NAMES OF ALL PARTIES TO THE TRIAL COURT'S JUDGMENT

*The parties to the trial court's judgment are the State of Texas and Appellant, Wendee Long.

*The case was tried before the Honorable Margaret Barnes, 367th District Court, Denton County.

*Counsel for Appellant at trial was Barry Sorrels and Stephanie A. Luce, 2311 Cedar Springs, Suite 250, Dallas, Texas 75201.

*Counsel for Appellant on appeal was Bruce Anton and Brett E. Ordiway, 2311 Cedar Springs, Suite 250, Dallas, Texas 75201.

*Counsel for Appellant before this Court is Bruce Anton, 2311 Cedar Springs, Suite 250, Dallas, Texas 75201.

*Counsel for the State at trial was Matthew J. Shovlin and Lindsey E. Sheguit, Denton County Assistant District Attorneys, 1450 E. McKinney Street, Suite 3100 Denton, Texas 76209.

*Counsel for the State on appeal was Charles E. Orbison and Andrea R. Simmons, Denton County Assistant District Attorneys, 1450 E. McKinney Street, Suite 3100 Denton, Texas 76209.

*Counsel for the State before this Court is John R. Messinger, Assistant State Prosecuting Attorney, P.O. Box 13046, Austin, Texas 78711.

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . .  2

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    **I.**      **What the court of appeals did..** . . . . . . . . . . . . . . . . . . . . . . .  7

    **II.**     **Rules for statutory construction..** . . . . . . . . . . . . . . . . . . . . . . .  10

    **III.**    **The statutory definition of "oral communication" is plain..** . . . .  11

    **IV.**    **Extratextual sources confirm the plain meaning of the statute..**   16

    **V.**      **Coach Townsend exhibited a justified expectation that his words would not be stolen by excluded parties..** . . . . . . . . . . . . . 34

    **VI.**    **Conclusion.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

APPENDIX       Texas House Committee on Criminal Jurisprudence Bill Analysis for H.B. 360, 67th Leg. R.S.

United States Senate Committee on the Judiciary Report No. 1097, 90th Cong., 2d Sess. (Excerpts)

# INDEX OF AUTHORITIES

**Cases**

*Alameda v. State*, 235 S.W.3d 218 (Tex. Crim. App. 2007).. . . . . . . . . . . . . . 8, 11

*Angel v. Williams*, 12 F.3d 786 (8th Cir. Mo. 1993).. . . . . . . . . . . . . . . . . . 26-27

*Bartnicki v. Vopper*, 532 U.S. 514 (2001).. . . . . . . . . . . . . . . . . . . . . . . . . 22-25

*Berger v. New York*, 388 U.S. 41 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Boddie v. American Broadcasting Cos.*, 731 F.2d 333 (6th Cir. Ohio 1984).  28-29

*Boykin v. State*, 818 S.W.2d 782 (Tex. Crim. App. 1991). . . . . . . . . . . . . . 6, 10-11

*Minnesota v. Carter*, 525 U.S. 83 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Castillo v. State*, 810 S.W.2d 180 (Tex. Crim. App. 1990). . . . . . . . . . . . . . . . . 11

*Chambless v. State*, 411 S.W.3d 498 (Tex. Crim. App. 2013). . . . . . . . . . . . . . . 10

*United States v. Clark*, 22 F.3d 799 (8th Cir. Iowa 1994). . . . . . . . . . . . . . . . . . 25

*United States v. Dunbar*, 553 F.3d 48 (1st Cir. Mass. 2009). . . . . . . . . . . . . 26-27

*Evens v. Superior Court*, 77 Cal. App. 4th 320 (Cal. App. 2d Dist. 1999, review denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

*Gonzales v. State*, 689 S.W.2d 900 (Tex. Crim. App. 1985) . . . . . . . . . . . . . . . . 9

*Ex parte Graves*, 853 S.W.2d 701 (Tex. App.–Houston [1st Dist.] 1993, pet. ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Harrelson*, 754 F.2d 1153 (5th Cir. Tex. 1985). . . . . . . . . . . 26-27

*Huff v. Spaw*, 794 F.3d 543 (6th Cir. Ky. 2015). . . . . . . . . . . . . . . . . . . . . . 29-31

*In re John Doe Trader Number One*, 894 F.2d 240 (7th Cir. Ill. 1990).. . . . . . 25, 28

iv

*Katz v. United States*, 389 U.S. 347 (1967). . . . . . . . . . . . . . . . . . . . 17, 20-21

*United States v. Larios*, 593 F.3d 82 (1st Cir. Mass. 2010). . . . . . . . . . . . . . . . . 27

*Lee v. Florida*, 392 U.S. 378 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Lee v. State*, 191 So. 2d 84 (Fla. 1966). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Liverman v. State*, 470 S.W.3d 831 (Tex. Crim. App. 2015). . . . . . . . . . . . . . . . 10

*Long v. State*, 469 S.W.3d 304 (Tex. App. El Paso 2015). . . . . . . . . . . . . . . . . 7-9

*United States v. Longoria*, 177 F.3d 1179 (10th Cir. Kan. 1999). . . . . . . . . . . . . . 9

*McDuff v. State*, 939 S.W.2d 607 (Tex. Crim. App. 1997) . . . . . . . . . . . . . . . . . 9

*United States v. McIntyre*, 582 F.2d 1221 (9th Cir. 1978). . . . . . . . . . . . . . . . . 8

*United States v. McKinnon*, 985 F.2d 525 (11th Cir. Fla. 1993). . . . . . . . . . 725, 27

*Meyer v. State*, 78 S.W.3d 505 (Tex. App.–Austin 2002, pet. ref'd). . . . . . . . . . . . 8

*Murray v. State*, 457 S.W.3d 446 (Tex. Crim. App. 2015).. . . . . . . . . . . . . . . . . 10

*United States v. Peoples*, 250 F.3d 630 (8th Cir. Mo. 2001). . . . . . . . . . . . . . 25, 27

*Plock v. Board of Education*, 545 F. Supp. 2d 755 (N.D. Ill. 2007). . . . . . . . 33-34

*Pollock v. Pollock*, 154 F.3d 601 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . 11

*Roberts v. Houston Independent School District*, 788 S.W.2d 107
(Tex. App.–Houston [1ˢᵗ Dist.] 1990, writ. denied). . . . . . . . . . . . . . . 33-34

*State v. Savage*, 933 S.W.2d 497 (Tex. Crim. App. 1996) . . . . . . . . . . . . . . . . . 9

*Smith v. Maryland*, 442 U.S. 735 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . 8, 18

*United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944). . . . . . 19

v

*United States v. Turner*, 209 F.3d 1198 (10th Cir. Wyo. 2000). . . . . . . . . . . . . 26-27

*Vinez v. State*, 08-10-00195-CR, 2012 Tex. App. LEXIS 817
  (Tex. App.–El Paso Feb. 1, 2012, no pet.) . . . . . . . . . . . . . . . . . . . . . . . 12

*Walker v. Darby*, 911 F.2d 1573 (11th Cir. Ala. 1990). . . . . . . . . . . . . . . . . 31-32

## Statutes and Rules

18 U.S.C. § 2510(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19, 30

CAL. PEN CODE § 632(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

TEX. CODE CRIM. PROC. art. 18.20 §1(2). . . . . . . . . . . . . . . . . . . . . . . . 1, 12

TEX. CODE CRIM. PROC. art. 18.20 §1(3). . . . . . . . . . . . . . . . . . . . . . . . . 14

TEX. PENAL CODE § 16.02(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

TEX. PENAL CODE § 16.02(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 15

TEX. PENAL CODE § 16.02(c)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## Other

Texas House Committee on Criminal Jurisprudence Bill Analysis for
  H.B. 360, 67th Leg. R.S.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

United States Senate Committee on the Judiciary Report No. 1097,
  90th Cong., 2d Sess.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-20

No. PD-0984-15

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

WENDEE LONG,                                                          Appellant

v.

THE STATE OF TEXAS,                                                  Appellee

* * * * *

**STATE'S BRIEF ON THE MERITS**

* * * * *

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the State of Texas, by and through its State Prosecuting Attorney, and respectfully presents to this Court its brief on the merits.

**STATEMENT OF THE CASE**

This case turns on the meaning of "oral communication." Appellant was convicted of procuring her daughter to intercept an oral communication and then intentionally disclosing its contents knowing it was obtained through that interception.[1] An "oral communication" is an "oral communication uttered by a person exhibiting an expectation that the communication is not subject to interception

---

[1] *See* TEX. PENAL CODE § 16.02(b)(1), (2).

1

under circumstances justifying that expectation."[2] The court of appeals decided that words spoken by a coach to his players are not "oral communication" because he "d[oes] not have [a] justifiable expectation that only they would acquire the contents of his communications."

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument was requested and granted.

**ISSUES PRESENTED**

1. **Does Penal Code section 16.02 prohibit intercepting and disclosing the contents of an oral communication even when the speaker has no expectation that his words will not be repeated by those present?**

2. **Does a basketball coach have a justifiable expectation that his pep talk in a girls' locker room will not be secretly recorded by a former player?**

**STATEMENT OF FACTS**

Appellant was a member of the Argyle ISD school board who had two daughters attending Argyle High School.[3] After Lelon "Skip" Townsend was hired as the varsity girls' basketball coach, appellant claims she began hearing stories about

---

[2] TEX. CODE CRIM. PROC. art. 18.20 §1(2). The term is defined, in part, by the term itself, presumably according to its lay meaning.

[3] State's Ex. 10, p.1 (Appellant's "Statement of Video Information" given by her attorney to police); 4 RR 114-16.

how mean Townsend was to his players.[4]  One of her daughters, Rose,[5] quit the team after the first game.[6]  Appellant encouraged the parents of players to call the school board about Townsend's alleged behavior.[7]

On February 7, 2012, Argyle's regular season ended with an away game at Sanger High School.[8]  When a team visits another school for a game, they are assigned a locker room.[9]  The visitor's locker room at Sanger High School is down a set of stairs past the gym.[10]  This area is "pretty much [for] athletes only."[11]  After descending the stairs "and back around," there is a hallway with three locker rooms.[12]  The visitor's locker room is the farthest one "all the way down on the right."[13]  One must pass through two doors to enter the locker room; the first opens to "a little

---

[4]  State's Ex. 10, p.1-3.

[5]  "Rose" is a pseudonym.

[6]  State's Ex. 10, p.1.

[7]  State's Ex. 10, p.4.

[8]  4 RR 145; State's Ex. 10, p.4.

[9]  4 RR 142-43.

[10]  4 RR 57-58.

[11]  4 RR 58.

[12]  4 RR 58.

[13]  4 RR 58; State's Ex. 1 (photo).

3

nothing room" with a door that opens to the locker room itself.[14]

"It's a private area."[15] As Townsend explained, that space is for the visiting team and coaches

> to have a refuge to get away from the people that are at the ball game. It's a place where we can go sit and talk. It's a place for our kids to sit and meditate before a game to -- it's a quiet place and a --a -- a place to dress, a place that we can call our own for about two and a half hours.[16]

The players put all their personal belongings there.[17] "It's supposed to be for our team and our coaches only."[18] "[I]t's a place where coaches and teammates can meet and discuss aspects of the game, get a scouting report together, do team activities, such as pray."[19]

That night, Rose told a Sanger student that her mom is the principal, she is the team manager, and she needed to get into Argyle's locker room because their coach was being mean to the players and she wanted to catch it on video.[20] They entered the locker room just before half-time and Rose taped her phone on the inside of a

---

[14] 4 RR 58, 60.

[15] 4 RR 60 (agreeing with counsel's statement).

[16] 4 RR 143.

[17] 4 RR 143.

[18] 4 RR 144.

[19] 4 RR 159.

[20] 4 RR 56-57.

4

locker.[21]

Rose went alone to retrieve the phone after half-time.[22] When her attempts to crop and e-mail the video resulted in most of it being lost, she re-entered the locker room so that she could record Townsend's post-game speech.[23] She waited and counted the players as they came out of the locker room after the game before she retrieved her phone.[24]

Sanger police interviewed the girls on the team and none of them were aware they were being recorded.[25] Townsend did not give anyone permission to record his remarks to his team.[26] He "was surprised[,]" and "had no idea that anyone would be videoing."[27] He felt "violated," like his privacy was invaded.[28]

Appellant showed the video to a co-worker between February and March of

---

[21]  4 RR 61-62; State's Ex. 10, p.4.

[22]  4 RR 62.

[23]  4 RR 73; State's Ex. 10, p.4.

[24]  State's Ex. 10, p.4.

[25]  4 RR 98.

[26]  4 RR 144.

[27]  4 RR 146.

[28]  4 RR 152-53.

2012.[29] She thought to herself, "Maybe if the board sees him in action?"[30] The video was distributed to members of the school board prior to its March meeting, when Townsend's contract was to be discussed.[31]

## SUMMARY OF THE ARGUMENT

The sufficiency of the evidence in this case turns on the meaning of the definition of "oral communication." The court of appeals ignored basic rules of statutory construction when it bypassed the plain language and, instead of analysis based in *Boykin v. State*,[32] relied exclusively on a single Ninth Circuit decision for its view of the legislative history of an analogous federal statute.

Review of the plain language of the statutory definition shows that it was intended to prevent the type of privacy violation presented in this case. Even if one cannot ensure that parties to a private conversation never disclose what they have heard, the legislature has sought to prevent people who are not parties from surreptitiously recording and disseminating private conversations. If the plain language is not enough to discount the interpretation espoused by the court of appeals and appellant, the absurdity of that interpretation in practice, the state and federal

---

[29] 4 RR 230-31. State's Ex. 8 and 9 (videos).

[30] State's Ex. 10, p.5.

[31] 4 RR 153-54.

[32] 818 S.W.2d 782 (Tex. Crim. App. 1991).

6

legislative histories, commentary from the Supreme Court, and persuasive federal cases show that it is untenable.

## **ARGUMENT**

Can anything that can be repeated by a listener be recorded by a stranger? When should someone expect that a hidden camera has been placed in a girls' locker room by someone who is not permitted inside? The answers to both questions depend on how this Court interprets the statutory definition of "oral communication."

## I.    **What the court of appeals did.**

In four separate points, appellant claimed that the evidence was legally insufficient and that the trial court erred in overruling her motions for directed verdict, judgment of acquittal, and new trial.[33]  Each of these points had the same basis: "because the complainant had no justifiable expectation that only his students would acquire the contents of his communication."[34]  The court of appeals addressed only appellant's  motions for directed verdict and judgment of acquittal, deciding it "need not address her remaining issues."[35]

The court based its decision on the meaning of "oral communication."  But it

---

[33]    App. CoA Br. at 3 (Table of Contents).

[34]    *Id*.

[35]    *Long v. State*, 469 S.W.3d 304, 313 (Tex. App.–El Paso 2015).

7

did not attempt to discern the meaning of the plain language of the statute, identify ambiguity or absurdity, or perform its own review of extratextual sources. Instead, claiming an ability to "rely on decisions . . . construing the [federal] Wiretap Act[,]"[36] it held, "The legislative history of the Wiretap Act reveals that Congress's intent was to protect persons engaged in oral communications under circumstances justifying an expectation of privacy."[37] This conclusion was attributed entirely to what the Ninth Circuit said about the federal legislative history in a single case.[38] Citing *Smith v. Maryland*, the case in which the Supreme Court adopted Justice Harlan's concurrence in *Katz v. United States* as the standard for Fourth Amendment cases, the court of appeals identified the two-pronged test it would use: "(1) did the person exhibit a subjective expectation of privacy; and (2), if so, is that subjective expectation one society is willing to recognize as reasonable."[39]

The court of appeals held that, because "instructional communications and activities, regardless of where they occur, . . . are always subject to public

---

[36]   *Long*, 469 S.W.3d at 308 (citing *Alameda v. State*, 235 S.W.3d 218, 222-23 (Tex. Crim. App. 2007), and *Meyer v. State*, 78 S.W.3d 505 (Tex. App.–Austin 2002, pet. ref'd)).

[37]   *Id*. at 308.

[38]   *Id*. (citing *United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978)). As it happens, *Meyer*, *supra*, also relies exclusively on a case from the First Court of Appeals that exclusively relies on *McIntyre* for the same proposition. *Meyer*, 78 S.W.3d at 509 (citing *Ex parte Graves*, 853 S.W.2d 701, 705 (Tex. App.–Houston [1st Dist.] 1993, pet. ref'd).

[39]   *Long*, 469 S.W.3d at 308 (citing 442 U.S. 735, 740 (1979)).

dissemination and generally exposed to the public view[,]" Townsend had no such justifiable expectation.[40] "Consequently, the recordings in dispute are not 'oral communications' covered by Section 16.02 of the Texas Penal Code."[41]

*A claim of legal insufficiency by any other name . . .*

As appellant acknowledged in the court of appeals, all four of her claims are challenges to the legal sufficiency of the evidence.[42] The sufficiency of the only challenged element turns on whether the definition provided for "oral communication" should be read according to its plain meaning or instead requires a court perform a standard Fourth Amendment "expectations" analysis. When a sufficiency-of-the-evidence issue turns in large part on the meaning of the statute, that

---

[40]  *Id*. at 311; *see also id*. ("society is not willing to recognize as reasonable any expectation of privacy in half-time and post-game instructional communications uttered by a public high school basketball coach to his team in the visiting locker room of a public high school.").

[41]  *Id*. at 313.

[42]  App. CoA Br. at 2 ("Did the trial court therefore err in overruling Long's motions for a directed verdict, judgment of acquittal, and new trial, and was the evidence thus legally insufficient, where the intercepted speech was a high school basketball coach's locker-room tirade?"). *See McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) ("a complaint about overruling a motion for directed/instructed verdict is in actuality an attack upon the sufficiency of evidence to sustain the conviction"); *State v. Savage*, 933 S.W.2d 497, 499 (Tex. Crim. App. 1996) ("a trial court's JNOV ruling after a jury determination of criminal guilt accomplishes exactly the same effect as granting the defendant a new trial for insufficient evidence -- a functional acquittal."); *Gonzales v. State*, 689 S.W.2d 900, 901 (Tex. Crim. App. 1985) ("Appellant challenges the sufficiency of the evidence, arguing the trial court erred in overruling his motion for new trial on the ground that the verdict rendered is contrary to the law and evidence.").

9

question is one of law reviewed *de novo*.[43]

## II.    Rules for statutory construction.

The first step is reading the statute. When determining the collective legislative intent or purpose of a statute, this Court necessarily focuses its attention on its literal text and attempts to discern the fair, objective meaning of that text at the time of its enactment.[44] "The best evidence of the Legislature's intent is the plain language of the law it passed[,]"[45] and "the Legislature is constitutionally entitled to expect that the Judiciary will faithfully follow the specific text that was adopted."[46]

Only if the plain language of a statute would lead to absurd results, or if the language is not plain but ambiguous, may a court consider such extratextual factors as legislative history.[47] Another such factor is the treatment of similar statutes in different jurisdictions. This Court has done so twice in cases dealing with this

---

[43]    *Liverman v. State*, 470 S.W.3d 831, 2015 Tex. Crim. App. LEXIS 992 at *7 (Tex. Crim. App. 2015). In this case, how the underlying facts are viewed could play a role. If so, the evidence should be viewed in the light most favorable to the verdict as usual. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

[44]    *Boykin*, 818 S.W.2d at 785.

[45]    *Chambless v. State*, 411 S.W.3d 498, 503-04 (Tex. Crim. App. 2013).

[46]    *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[47]    *Id*. at 785-86.

statutory scheme.[48]  Both cases make clear that this consideration cannot come at the

expense of independent analysis.[49]  At the very least, a reviewing court cannot simply

rely on a single case's conclusory statement about a similar statute's legislative

history, as did the court of appeals in this case.

## III.  The statutory definition of "oral communication" is plain.

An "oral communication" is an "oral communication uttered by a person

exhibiting an expectation that the communication is not subject to interception under

---

[48]  *Alameda*, 235 S.W.3d at 222-23; *Castillo v. State*, 810 S.W.2d 180, 183 (Tex. Crim. App. 1990).

[49]  In *Castillo*, a pre-*Boykin* case, this Court's "initial task [wa]s to ascertain the meaning of the terms 'aural acquisition' and 'interception.'"  810 S.W.2d at 183.  It framed its attempt to effectuate the collective "intent" or "purpose" of the Legislature to include the legislative history of the statute, the consequences of any particular construction (with a presumption that the Legislature intended a reasonable result), and, "Finally, because [the term's definition] was borrowed from the federal wiretap statute, . . . the construction placed upon the federal statute by other courts."  *Id*. (citations omitted).  The Court noted dueling interpretations, and went on to hold that "the language of [the statute] plainly contemplates" a certain meaning and that the contrary interpretation "is unreasonable and probably does not reflect the intent of the Legislature" based on the relevant legislative history and policy consequences.  *Id*. at 184.

In *Alameda*, this Court considered whether a mother could vicariously consent to the recording of phone conversations between her 13-year-old child and a child molester without either of their knowledge.  235 S.W.3d at 220.  "Because no Texas cases have addressed a parent's ability to vicariously consent to the recording of a child's telephone conversations, and the federal wiretap statute is substantively the same as the Texas statute," this Court looked to the "leading case" regarding the vicarious-consent doctrine in the context of the federal wiretap statute.  *Id*. at 222 (citing *Pollock v. Pollock*, 154 F.3d 601 (6th Cir. 1998)).  But identifying the holding of the "leading case" did not end the inquiry; this Court conducted a complete policy analysis that, while informed by persuasive authority, addressed each of Alameda's arguments in turn and arrived at its own conclusion.  *Id*. at 222-23.

11

circumstances justifying that expectation."[50]  This language is plain and it makes

sense in context.[51]  Section 16.02(b)(1) prohibits intentionally procuring another

person to intercept, through the use of an electronic device, words uttered by someone

exhibiting a justified expectation that they are not subject to interception.  Section

(b)(2) prohibits intentionally disclosing the contents of an utterance the actor knows

was unlawfully intercepted under (b)(1).  It is an affirmative defense that "a person

. . . intercepts a[n] . . . oral . . . communication, if: (A) the person is a party to the

communication; or (B) one of the parties to the communication has given prior

consent to the interception, unless the communication is intercepted for the purpose

of committing an unlawful act[.]"[52]

Read as a whole, this statutory scheme concerns a specific type of invasion of

privacy unrelated to whether someone present could repeat what she heard.  Rather,

it prohibits people who are not party to a conversation from recording that

---

[50]  TEX. CODE CRIM. PROC. art. 18.20 §1(2).

[51]  In fact, this court of appeals has reviewed a claim of illegally obtained recordings under section 16.02(b)(1) using only the plain language of the statute, without reference to the federal Wiretap Act or any other extratextual sources.  *Vinez v. State*, 08-10-00195-CR, 2012 Tex. App. LEXIS 817, *5-6 (Tex. App.–El Paso Feb. 1, 2012, no pet.) (not designated ro publication) ("In our view, these circumstances did not justify an expectation that Vinez's oral communications were not subject to police interception.") (citations omitted).  It did, however, compare the circumstances to those in which this Court and another found no reasonable expectation of privacy in jail phone calls or between co-defendants at a county jail.  *Id*. at *6.  This overlap will be discussed below.

[52]  TEX. PENAL CODE § 16.02(c)(4).

12

conversation without the knowledge or consent of the parties, provided the parties recorded exhibited a justified expectation that they would not be recorded. Put another way, under objectively justifiable circumstances, the law prohibits acquiring the contents of oral utterances without the consent, implied or express, of at least one of the parties.

*What the plain language does not say is as important as what it does.*

While the plain language of the statute does require the jury to determine whether an expectation is justified—*i.e.*, reasonable—it does not mention anything about some broad "right to privacy." Instead, the interest at stake is the much narrower expectation of not being recorded.

There is also no requirement that the State prove the victim's subjective expectation, as is necessary in a traditional Fourth Amendment analysis. The statute requires only that the victim "exhibit[] an expectation that the communication is not subject to interception." "Exhibition" is a fact question determinable from a victim's actions; it is not enough that the jury believe the victim harbored such an expectation. The interceptor should not be liable for violating an expectation that is not exhibited, but she also should not be permitted to ignore an apparent exhibition of an expectation of non-interception on the off chance it does not exist. This statute exists for the speaker's benefit, not the interceptor's.

13

Finally, the definition of "oral communication" does not refer to the "contents" being intercepted; it refers to the uttered communication itself. The incorporation of the term "intercept" by reference does not change this. True, "intercept" means "the aural or other acquisition of the *contents* of a wire, oral, or electronic communication through the use of an electronic, mechanical, or other device."[53] In context, however, "the contents" of an utterance aurally acquired necessarily includes the speaker's voice, and his voice must be acquired by a device.

*Appellant's interpretation is absurd*

There is nothing extraordinary about preventing technological eavesdropping, or preventing violators from spreading what they have illegally acquired. But an interpretation of the statute that focuses exclusively on the ultimate security of the contents rather than the specific method of acquisition not only renders the statute a virtual nullity but produces absurd results.

The court of appeals held that what Townsend said was not protected by statute because he could not expect parties to the communication—his team—not to repeat any of it. If that is all that matters, the statute has little or no purpose. Outside of a relationship of professional privilege or contractual non-disclosure, no one can reasonably expect that something shared will never be repeated by the listener(s). If

---

[53] TEX. CODE CRIM. PROC. art. 18.20 §1(3) (emphasis added).

repetition were impossible, trust would be unnecessary. The court's interpretation renders the statute, which on its face is broadly applicable, useless in all but circumstances in which the speaker is already protected by law.

It could be that appellant and the court of appeals, without saying so, look at 16.02(b)(2)—the "disclosure" aspect of the offense—and ask what difference it makes who reveals the contents if no listener was bound. This would miss the point of subsection (b)(2), which is meant to prevent anyone from knowingly profiting from or exacerbating an already-existing violation of the subsection. It is akin to the "fruit of the poisonous tree" doctrine; it was neither written nor intended as a blanket ban on repeating anything one hears.

Second, the undesirable practical effect of a "privacy of contents" approach is apparent. As noted above, it is an affirmative defense that the interceptor is a party to the communication. Because one's spouse could legally record what is done or said in the marital bedroom and share it with a third party, the "content" rationale dictates that a third party could simply cut out the middle man with no harm done. This cannot be the legislature's intent. This absurdity can be avoided by adhering to the plain language of the statute, which prevents intrusions by third parties.

## IV.   Extratextual sources confirm the plain meaning of the statute.

If resort to extratextual sources is necessary, the federal and state legislative histories, policy pronouncements of the Supreme Court, and better-reasoned decisions interpreting the federal analogue all support a framework that focuses on the narrow expectation of being free from electronic interception.

*Texas legislative history*

According to the Bill Analysis from the House Criminal Jurisprudence Committee, article 18.20 and section 16.02 were passed in response to Title III's statement that "states must enact specific legislation if they desire to implement the authority granted in the [Omnibus Crime Control and Safe Streets] Act to conduct electronic surveillance."[54]   Article 18.20 "generally follows the provisions of Title III" except for provisions not relevant here.[55]   Little is said about section 16.02, except that it "[p]rovides a penal sanction for the interception and/or disclosure of wire or oral communications outside the scope of this Act[,]" and that exceptions are provided for, *inter alia*, "[c]onsensual surveillance."[56] The author acknowledged that

---

[54]   The Bill Analysis for H.B. 360, 67th Leg. R.S., p.1.   The analysis can be found at http://www.lrl.state.tx.us/LASDOCS/67R/HB360/HB360_67R.pdf#page=45 but is also included in the  Appendix.

[55]   Bill Analysis at 1.

[56]   *Id*. at 4.

Texas's statute could be "more restrictive than the Federal Act, and therefore more protective of individual privacy . . . ."[57] Based on this fact alone, it is not unreasonable to conclude that whatever ambiguity exists in the statute should be construed in favor of protection from interception regardless of whether Congress intended the Wiretap Act to be the mere statutory adoption of what was then an unsettled Fourth Amendment expectation-of-privacy analysis.

*Federal legislative history*

But the report of the United States Senate Committee on the Judiciary shows that the bill was not meant to codify what would later become the subjective/objective analysis for privacy.[58] Title III of the Omnibus Crime Control and Safe Streets Act of 1968, also known as the "Wiretap Act," was created in response to the Supreme Court's then-recent cases on wiretapping and electronic surveillance, *Berger v. New York*, 388 U.S. 41 (1967), and *Katz v. United States*, 389 U.S. 347 (1967).[59] Recognizing that "authorized wiretapping and electronic surveillance techniques by

---

[57] *Id*. at 1.

[58] S. Rep. No. 1097, 90th Cong., 2d Sess., Reprinted in (1968) U.S.Code Cong. & Admin.News (hereafter referred to as U.S.C.C.A.N.) beginning at p. 2112. Further cited pages are included in the Appendix.

[59] In *Berger*, the Supreme Court struck down New York statutory scheme providing for the installation of recording devices on the ground that the framework for obtaining judicial approval lacked the particularity and proof of suspicion required by the Fourth Amendment. 388 U.S. at 54-60. *Katz* is discussed in detail *ante*.

17

law enforcement officials are indispensable legal tools,"[60] "the drafters "used the *Berger* and *Katz* decisions as a guide in drafting title III."[61] Both *Berger* and *Katz* are summarized in some detail in the report.[62] As it stated in its list of people and organizations supporting the bill, "the purpose of title III" was creating "[l]egislation meeting the constitutional standards set out in the decisions, and granting law enforcement officers the authority to tap telephone wires and install electronic surveillance devices in the investigation of major crimes and upon obtaining a court order[.]"[63]

Regarding the specific provisions at issue, "[e]ach section of title III is discussed in detail in the analysis section of this title, including those provisions which are intended to conform to the *Berger* and *Katz* decisions."[64] Section 2510 contained applicable definitions, including that for "oral communication," which was written "to include any oral communication uttered by a person exhibiting an

---

[60] U.S.C.C.A.N. at 2161.

[61] *Id*. at 2163.

[62] *Id*. at 2161-62. Relevant later, only the majority opinion of *Katz* is mentioned. Neither Justice Harlan nor the privacy analysis set forth in his concurrence, which years later would be adopted by the Supreme Court in *Smith v. Maryland* as the standard for expectations of privacy and later standing, are mentioned.

[63] U.S.C.C.A.N. at 2163.

[64] *Id*. at 2163.

18

expectation that such communication is not subject to interception under circumstances justifying that expectation."[65] This definition was "intended to reflect existing law[,]" citing *Katz*.[66] Thus, "The person's subjective intent or the place where the communication is uttered is not necessarily the controlling factor." "[S]uch an expectation," referring in context to "an expectation that such communication is not subject to interception," "would clearly be unjustified in certain areas; for example, a jail cell or an open field."[67] And while a person would "[o]rdinarily . . . be justified in relying on such expectation when he was in his home or office, . . . even there, his expectation under certain circumstances could be unwarranted, for example, when he speaks too loudly."[68] The analysis of that section concluded: "the person's expectation that his communication is or is not subject to "interception" . .

---

[65]   *Id*. at 2178 (codified at 18 U.S.C. § 2510(2)).

[66]   *Id*.  The reader is also asked to "compare" *Lee v. State*, 191 So. 2d 84 (Fla. 1966), an intermediate appellate court opinion about the legality of police arranging with the telephone company to set up a recorder on a party line, and *United States v. South-Eastern Underwriters Ass'n* (SEUA), 322 U.S. 533 (1944), which "required the Court to decide the issue of whether the Commerce Clause grants to Congress the power to regulate insurance transactions stretching across state lines." *Id*. at 534.  *Lee* was presumably cited because it asserted that "there were no state or federal statutes applicable in Florida which would make wiretapping illegal and inadmissible in evidence," 191 So. 2d at 85, and SEUA to demonstrate Congress's authority to create it.  The Senate report noted that Lee's petition for writ of certiorari was granted.  *Lee* was subsequently reversed by the Supreme Court on the grounds that the police conduct violated the Federal Communications Act of 1934.  *Lee v. Florida*, 392 U.S. 378, 380 (1968).

[67]   U.S.C.C.A.N. at 2178 (citations omitted).

[68]   *Id*. (citations omitted).

. is thus to be gathered and evaluated from and in terms of all the facts and circumstances."[69]

The federal definition of "oral communication" was thus intended to say exactly what it says. As should be expected in a statutory scheme about electronic surveillance, the term defining the focus of secret recording hinges on the expectation that what you are saying is not being secretly recorded. It is not, as uncritically accepted by the court of appeals, about a broad expectation of privacy or even the narrower expectation that what you say will never be repeated to anyone by the other party. This is entirely consistent with *Katz*, which it was "intended to reflect."

Katz was convicted of transmitting wagering information across state lines via telephone.[70] The FBI obtained his conversations through an electronic listening and recording device attached to the outside of the public telephone booth he used to placed his calls.[71] The Supreme Court rejected any formulation of the issues based on the "incantation of the phrase 'constitutionally protected area'" or a "general constitutional 'right to privacy.'"[72] "That Amendment protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and

---

[69]    *Id.*

[70]    *Katz*, 389 U.S. at 348 & n.1.

[71]    *Id*. at 348.

[72]    *Id*. at 349-50.

often have nothing to do with privacy at all."[73]

Stating that "the Fourth Amendment protects people, not places," *Katz* held that "what [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."[74] Distinguishing the various privacy interests at play, it pointed out that "what [Katz] sought to exclude when he entered the booth was not the intruding eye -- it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen."[75] "One who occupies [a phone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world."[76] "The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment."[77]

Comparison of the federal definition of "oral communication" with the Supreme Court's analysis shows that the definition does indeed reflect the majority

---

[73]  *Id*. at 350.

[74]  *Id*. at 351.

[75]  *Id*. at 352.

[76]  *Id*.

[77]  *Id*. at 353.

21

opinion in *Katz*. By entering the phone booth and shutting the door, even in public, Katz exhibited an expectation that, while he could be seen and perhaps his lips read, what he "utters" would not be recorded by strangers to the conversation and then "broadcast to the world." This was justified under the circumstances. The definition of "oral communication" provides no more, nor any less, protection. It is thus difficult to argue with the Supreme Court's conclusion in *Bartnicki v. Vopper* that Congress drafted Title III "[l]argely in response to [*Berger*], and to our *holding* in *Katz v. United States*, that the attachment of a listening and recording device to the outside of a telephone booth constituted a search . . . ."[78]

In short, *Berger* was about wiretapping and electronic surveillance. *Katz* was about wiretapping and electronic surveillance. Title III was about wiretapping and electronic surveillance in response to *Berger* and *Katz*. It makes no sense to hold that Title III, or a statute that mirrors it, is concerned with broad issues of privacy or privilege rather than the narrow issue of wiretapping, electronic surveillance and the fruits of those specific violations.

*Policy supports a plain reading of the statute.*

If the Senate Report is insufficient to confirm the meaning of the statute from which the Texas scheme was derived, the policy behind Title III—and the prohibition

---

[78]    532 U.S. 514, 523 (2001) (emphasis added) (citations omitted).

22

on disclosure in particular—were thoroughly considered by the Supreme Court in *Bartnicki v. Vopper*.  In that case, the Supreme Court addressed the "novel and narrow" question of, "Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?"[79]  Its holding was based on specific facts and legal claims not present in this case,[80] but its analysis considered the purpose of criminalizing the disclosure of private conversations.

While the First Amendment is typically cited for our freedom of speech, "[t]here is necessarily, and within suitably defined areas, a concomitant freedom not to speak publicly, one which serves the same ultimate end as freedom of speech in its

---

[79]   *Id*. at 517, 528 (2001).

[80]   An illegal recording of a phone conversation between a union representative and its president was ultimately provided to and aired by a local radio host.  *Id*. at 518-19.  In it, the two discussed threats of violence against their opposition.  *Id*. at 518.  The Supreme Court's decision to hold the federal analogue to section 16.02(b)(2) unconstitutional as applied were based on three distinguishing characteristics: 1) "respondents played no part in the illegal interception," 2) "their access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else[,]" and 3) "the subject matter of the conversation was a matter of public concern[;] [i]f the statements about the labor negotiations had been made in a public arena -- during a bargaining session, for example -- they would have been newsworthy." *Id*. at 525. The concurrence, accounting for the fifth and sixth votes of the majority, was more forceful, agreeing with the "narrow holding . . . limited to the special circumstances present here: (1) the radio broadcasters acted lawfully (up to the time of final public disclosure); and (2) the information publicized involved a matter of unusual public concern, namely a threat of potential physical harm to others." *Id*. at 535-36 (Breyer, J., concurring) (citation and internal quotations omitted).  "Given these circumstances, along with the lawful nature of [the broadcasters'] behavior, the statutes' enforcement would disproportionately harm media freedom." *Id*. at 540.

23

affirmative aspect."[81]  "In a democratic society[,] privacy of communication is essential."[82]  "Title III's restrictions are intended to protect that interest, thereby encouraging the uninhibited exchange of ideas and information among private parties . . . ."[83] As the Presidents's Commission on Law Enforcement and Administration of Justice put it, "Fear or suspicion that one's speech is being monitored by a stranger, even without the reality of such activity, can have a seriously inhibiting effect upon the willingness to voice critical and constructive ideas."[84]  The court called this "a chilling effect on private speech."[85]  Moreover, "the disclosure of the contents of a private conversation can be an even greater intrusion on privacy than the interception itself."[86]  "As a result, there is a valid independent justification for prohibiting such disclosures by persons who lawfully obtained access to the contents of an illegally intercepted message, even if that prohibition does not play a significant role in preventing such interceptions from occurring in the first place."[87]

---

[81]  *Id.* at 533 n.20 (2001) (citations and internal quotations omitted).

[82]  *Id*. at 533 (quoting The Challenge of Crime in a Free Society 202 (1967)).

[83]  *Id*. at 532 (citations and internal quotations omitted).

[84]  *Id*. at 533 (quoting The Challenge of Crime in a Free Society 202 (1967)).

[85]  *Id*.

[86]  *Id*. at 533.

[87]  *Id*.

24

Again, whatever ambiguity exists in the definition of "oral communication" should be resolved in favor of an interpretation that supports prohibition of the monitoring and dissemination of private speech by strangers to that communication. *Federal courts that attempt an analysis support the plain language.*

To whatever extent this Court's analysis is to be influenced by federal cases on Title III, there is no "leading case" as there was in *Alameda*. There are certainly many cases that, like the single case relied upon by the court of appeals, treat the analyses under Title III and the Fourth Amendment as identical, explicitly or otherwise.[88] There are also a number of opinions that are unclear, at times focusing on the plain language of the statute but also applying Justice Harlan's formulation of *Katz* or treating the analyses as equivalent.[89] At least one case reduces the issue to the

---

[88] *See, e.g.*, *United States v. Peoples*, 250 F.3d 630, 637 (8th Cir. Mo. 2001) ("Before the interception of a conversation can be found to constitute a search under the Fourth Amendment or an 'oral communication' under the federal wiretap law, therefore, the individuals involved must show that they had a reasonable expectation of privacy in that conversation."); *United States v. Clark*, 22 F.3d 799, 801 (8th Cir. Iowa 1994) ("Under either the fourth amendment or the Wiretap Act, the inquiry is 1) whether defendant manifested a subjective expectation of privacy, and 2) if so, whether society is prepared to recognize that expectation as reasonable."); *United States v. McKinnon*, 985 F.2d 525, 527 (11th Cir. Fla. 1993) ("the statutory and constitutional test is whether a reasonable or justifiable expectation of privacy exists. . . . First, whether McKinnon's conduct exhibited a subjective expectation of privacy; second, whether McKinnon's subjective expectation of privacy is one that society is willing to recognize as reasonable."); *In re John Doe Trader Number One*, 894 F.2d 240, 242-43 (7th Cir. Ill. 1990) ("Congress limited its protection of 'oral communications' under Title III to those statements made where 'first, a person [has] exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as reasonable.'") (citing *Katz*, 389 U.S. at 361 (Harlan, J., concurring)).

[89] *United States v. Dunbar*, 553 F.3d 48, 57 (1st Cir. Mass. 2009) (citations omitted) (quoting

(continued...)

25

expectation of revelation, like the court of appeals in this case.[90] Others are, for lack of a better word, unique.[91]

---

[89](...continued)
definition of "oral communication," agreeing that the legislative history shows that Congress intended this definition to "parallel the 'reasonable expectation of privacy test' articulated by the Supreme Court in *Katz*[,]'" and holding "that the back of a police car is not a place where individuals can reasonably expect to communicate in private."); *United States v. Turner*, 209 F.3d 1198, 1200-01 (10th Cir. Wyo. 2000) (equating an "actual, subjective expectation of privacy" with the expectation "that his communications were not subject to interception" but deciding that it "need only address the second, objective prong" and concluding that "under Title III or the Fourth Amendment, society is not prepared to recognize an expectation that communications in a patrol car, under facts presented here, are not subject to interception."); *United States v. Harrelson*, 754 F.2d 1153, 1169-71 (5th Cir. Tex. 1985) (framing the "question presented" as "whether the Harrelsons had a reasonable expectation of privacy as they spoke to each other in jail" but, after quoting the entire Senate Report analysis on "oral communication," holding that Harrelson's conversations were not oral communications because "evidence showing the Harrelsons to have known or suspected that attempts would be made to eavesdrop on their conversations at the jail."); *Angel v. Williams*, 12 F.3d 786, 790 n.6 (8th Cir. Mo. 1993) (citation omitted) (claiming not to "resolve the dispute between the parties whether, as the officers suggest, the expectation of non-interception is different in some way from the Fourth Amendment expectation of privacy."), *id*. at 790 ("We hold that the circumstances here do not justify an expectation that the incident in question was not subject to interception, and therefore no statutory 'oral communications' of the officers were intercepted.").

[90]    *United States v. Longoria*, 177 F.3d 1179, 1181-82 (10th Cir. Kan. 1999) (citations omitted) ("for Title III to apply, the court must conclude: (1) the defendant had an actual, subjective expectation of privacy - i.e., that his communications were not subject to interception; and (2) the defendant's expectation is one society would objectively consider reasonable."), 1183 (concluded that Longoria "had no reasonable expectation that the person in whose presence he conducts conversations will not reveal those conversations to others.").

[91]    A good example is *United States v. Larios*, 593 F.3d 82, 92-93 (1st Cir. Mass. 2010).  That court used an analysis "parallel" to *Katz* with the clarification that the expectation of privacy at issue was "that his communications were not subject to interception[,]" but "concluded that the most reasonable reading of the statute is that the meaning of 'oral communication' was intended to parallel *evolving* Fourth Amendment jurisprudence on reasonable expectations of privacy in one's communications."  *Id*. at 92.  It then denied the claim based on *Minnesota v. Carter*, 525 U.S. 83 (1998), a case decided on the lack of privacy interest of a brief visitor to a motel room for a drug deal.  *Id*. at 93 (emphasis in original).  However, the court also considered that "at least in theory, privacy interests in not being overheard may be greater than in not being seen, and vice versa, depending on the circumstances of the case[,]" and that "as a general matter, whether an individual
(continued...)

26

What nearly all of these cases have in common is that the facts presented a typical law enforcement scenario, *i.e.*, the recorded conversation took place in a police car,[92] at a jail or police station,[93] during a sting operation,[94] or in front of a government agent or informant.[95] Those cases make it easy to avoid any deep statutory analysis because, regardless of the framework used, society is not prepared to recognize an expectation that such communications are in any way private. The cases in which greater care was taken to apply the plain language of the statute to

---

[91](...continued)
has a reasonable expectation of privacy may depend in part on the nature of the government intrusion." *Id*. at 94. Performing a separate analysis, it concluded that there was "no reasonable expectation that he would be free from audio surveillance during his brief visit to another person's motel room." *Id*. at 94-95.

[92]    *Dunbar*, 553 F.3d at 53 (audio recording equipment inside the cruiser recorded incriminating statements made by Dunbar to his wife); *Clark*, 22 F.3d at 800-01 (trooper activated tape recorder on his dash after Clark and the driver asked if they could sit in the patrol car during the consensual search of the car); *Turner*, 209 F.3d at 1199 (Turner's conversation with a companion recorded in the back seat of a highway patrol car by a concealed tape recorder); *McKinnon*, 985 F.2d at 526 (tape recording of his pre-arrest conversation while he sat in the back seat area of a police car).

[93]    *Harrelson*, 754 F.2d at 1169 (Harrelson's conversations with his wife during her visits to him at the Harris County Jail were recorded by a career criminal who occupied the neighboring cell using a disguised tape recorder given to him by the FBI); *Angel v. Williams*, 12 F.3d at 787-88, 790 (tape-recording of an incident that took place in a public jail and between police officers and a prisoner played at an administrative hearing on alleged excessive force); *Peoples*, 250 F.3d at 634-45 (recorded conversation between a prison inmate and visitor).

[94]    *Larios*, 593 F.3d at 85 (DEA agents rented two rooms at a Motel 8 and installed a concealed audio/video recording device in one to record a drug deal in the other).

[95]    *In re John Doe Trader Number One*, 894 F.2d at 241 (undercover FBI agents wearing recording devices posed as traders on the floor of the Chicago Mercantile Exchange as part of a grand jury investigation); *Longoria*, 177 F.3d at 1181 (a government informant overheard and recorded Longoria conversing with his co-defendants in the informant's tire shop).

ascertain the intent of the drafters present more novel scenarios: unethical television interviewers, pocket dialing, and office surveillance.

In *Boddie v. American Broadcasting Cos.* (ABC), an alleged participant in a judicial scandal consented to be interviewed by Geraldo Rivera and others in her home but refused to appear on camera.[96] Unbeknownst to Boddie, the journalists recorded the interview by using a hidden videotape camera and concealed microphones.[97] A segment of her interview, with video and audio, aired on "20/20."[98] In response to her suit under Title III, ABC argued that Boddie had no reasonable expectation of privacy.[99] Quoting the definition of "oral communication," the court distinguished Boddie's undisputed "aware[ness] that she was speaking with reporters from ABC" from "whether Boddie had an expectation that the interview was not being recorded and whether that expectation was justified under the circumstances."[100] It noted that:

the statute requires that the plaintiff show only no expectation that the oral communication was being intercepted through the use of electronic devices. Thus, there "may be some circumstances where a person does not have an

---

[96]   731 F.2d 333, 335 (6th Cir. Ohio 1984).

[97]   *Id*.

[98]   *Id*.

[99]   *Id*. at 338.

[100]   *Id*. at 338-39.

expectation of total privacy, but still would be protected by the statute because he was not aware of the specific nature of another's invasion of his privacy."[101]

So, while Boddie could not reasonably expect that the words she said to Geraldo would not be repeated, she was justified in expecting that her interview would not be recorded and broadcasted because she spoke on that condition.

In *Huff v. Spaw*,[102] that court elaborated on how the definition of "oral communication" dictates the framework. Huff pocket-dialed Spaw, a co-worker, who listened to and transcribed or recorded large portions of a lengthy conversation between Huff and a colleague and, later, Huff and his wife.[103] The court noted that the appropriate expectations analysis "parallels the reasonable-expectation-of-privacy test articulated by Justice Harlan in *Katz*,"[104] but drew crucial distinctions based on the plain language of the definition. "Courts generally refer to *Katz*'s reasonable-expectation test as having a subjective part and an objective part, but the division of labor between these two parts is ill-defined in the Title III context."[105] It concluded that "whether a person had an internal belief in an expectation of privacy

---

[101] *Id*. at 339 (quoting *Bianco v. American Broadcasting Cos.*, 470 F. Supp. 182, 185 (N.D. Ill. 1979)).

[102] 794 F.3d 543 (6th Cir. Ky. 2015).

[103] *Id*. at 545.

[104] *Id*. at 548.

[105] *Id*. at 549.

. . . is irrelevant because it is subsumed by the exhibited-an-expectation inquiry":

> If a person lacked an internal belief in privacy, then he would not have exhibited an expectation of privacy and so would fail the reasonable-expectation test. If the person held an internal belief but did not exhibit that belief in an outward manner, he would also fail the reasonable-expectation test due to his inability to satisfy the first objective subpart. Therefore the only relevant inquiries are the two objective subparts: (1) whether a person exhibited an expectation of privacy and (2) whether that expectation was reasonable. . . . These two inquires track Title III's statutory text that first, a person "exhibit[ed] an expectation that such communication is not subject to interception" and second, "under circumstance justifying such expectation." 18 U.S.C. § 2510(2). We therefore bifurcate *Katz*'s reasonable-expectation test—at least in the Title III context—into these two inquiries.[106]

So there is a parallel, two-step analysis but it must be different because the statute requires a focus 1) on exhibition rather than internal beliefs, and 2) on "interception" rather than general privacy interests. Applying this framework to the facts, the court held that Huff did not exhibit any expectations because he was aware of the phenomenon of pocket-dialing and did not take appropriate measures to prevent it.[107] His wife, however, was not held responsible for his negligence. Citing *Boddie v. ABC*, the court reiterated "that someone who knowingly converses with a person who may be carrying an interception-capable device can nonetheless enjoy a reasonable

---

[106] *Id*. at 549-50.

[107] *Id*. at 552.

expectation of privacy from interception."[108] It held that "[Mrs.] Huff's expectation

of privacy from interception was justified under the circumstances."[109]

A similar analysis was conducted by the Eleventh Circuit in *Walker v. Darby*.[110]

A coworker told Walker to be careful about what he said while standing near his work

station, or "case area," because he believed that Walker's conversations were being

monitored.[111] Walker filed a Title III complaint after he found an "intercom-like

object" and another box with buttons near his workstation.[112] The court identified

three relevant issues based on the plain language of the definition of "oral

communication."[113] The court was explicit:

> We note as an initial matter that we do not need to determine whether Walker
> had a reasonable expectation of privacy in his case area in the Florence Post
> Office. The statute requires us to determine whether he had a subjective

---

[108] *Id.*

[109] *Id.* at 554.

[110] 911 F.2d 1573 (11th Cir. Ala. 1990).

[111] *Id.* at 1575.

[112] *Id.*

[113] *Id.* at 1577 (citing 18 U.S.C. § 2510) (identifying the summary judgment elements as "1) whether Walker's communications were indeed intercepted by Darby, Day, and Robinson through the use of any electronic, mechanical or other device; 2) whether Walker had an expectation that his oral communications were not subject to interception; and 3) whether, if Walker had such an expectation, the expectation was justified under the circumstances." *See also id.* at 1578 ("In order to survive summary judgment, Walker would have had to raise a question of fact for trial regarding whether he expected his conversations to be free from interception, and whether, if he had this expectation, it was justified by the circumstances.").

expectation that his conversations were free from interception, and whether that expectation was objectively reasonable.[114]

It reiterated:

> Again, we must distinguish this inquiry from the question of whether Walker had an objectively reasonable expectation that conversations taking place near his case would be overheard. The case was located in an area shared with other workers. But while Walker might have expected conversations uttered in a normal tone of voice to be overheard by those standing nearby, it is highly unlikely that he would have expected his conversations to be electronically intercepted and monitored in an office in another part of the building.[115]

Like the Sixth Circuit, the Eleventh Circuit recognized that the focus of Title III is narrower than a generic right to privacy, and that even the understanding that your words may be overheard by others is different from expecting them to be secretly electronically monitored by remote interceptors.

As illustrated, there is a case for every view of the statute. And circuit courts sometimes change position without explanation, perhaps based on the traditional police scenarios presented.[116] But many of the cases espousing the "subjective/objective expectation of privacy" model do so based on uncritical adoption of other courts' decisions; bad ideas do not get better through repetition.

---

[114]  *Id*. at 1578.

[115]  *Id*. at 1579.

[116]  For example, the Eleventh Circuit decided *Walker v. Darby* three years before it decided *McKinnon*, which found no reasonable expectation of privacy in the backseat of a patrol car.

32

The more thorough cases from the Sixth and Eleventh Circuits are more persuasive, but there is no substitute for a court adhering to its own framework for statutory construction and making its own determination.

*Cases relied upon by appellant and the court of appeals are irrelevant.*

The court of appeals reviewed three cases which it said "make clear that an educator has no expectation of privacy in a space where he or she is providing instructional communications and activities to students."[117] These cases are *Roberts v. Houston Independent School District*,[118] *Plock v. Board of Education*,[119] and *Evens v. Superior Court*.[120] If these cases were cited to prove that children repeat things, it was unnecessary. And their facts make them readily distinguishable. In two cases, the teachers objected to the "open and obvious" use of cameras, with their knowledge, in the classroom by school administrators.[121] In the third case, two students surreptitiously videotape-recorded their teacher who, along with her union, sought an injunction prohibiting the school board and district from viewing, showing or

---

[117] *Long*, 469 S.W.3d at 313.

[118] 788 S.W.2d 107 (Tex. App.–Houston [1st Dist.] 1990, writ. denied).

[119] 545 F. Supp. 2d 755 (N.D. Ill. 2007).

[120] 77 Cal. App. 4th 320 (Cal. App. 2d Dist. 1999, review denied).

[121] *Roberts*, 788 S.W.2d at 108 (use of videotaping as part of performance review); *Plock*, 545 F. Supp. 2d at 756 ("open and obvious" installation of cameras in response to recent allegations of abuse).

distributing the videotape.[122]  None of these cases shed light on the present situation: prosecution for violation of a statute designed to protect a speaker from being secretly recorded by people who were not permitted into the room.

## IV.  Coach Townsend exhibited a justified expectation that his words would not be stolen by excluded parties.

The plain language of the statute is also its only reasonable interpretation. Based on the plain language, what Townsend said to his team was an "oral communication" if, when he said it, he exhibited a justified expectation that it would not be electronically stolen by people he had excluded from the room.  Townsend's words were uttered in an area of the school that was generally for athletes only, at the farthest point in this area from the rest of the people in attendance, behind two closed doors, in an area for his team and staff only that he considers their "refuge" and "a place we can call our own."  This place also happened to be a girls' locker room where the girls changed clothes before and after the game.  It is unclear what extra steps he should have taken to exhibit a more clear expectation that people excluded from his team's refuge would not sneak in and plant recording devices.[123]  It is similarly unclear how anyone in that situation would not be justified in that

---

[122]  77 Cal. App. 4th at 322.  California requires all parties to consent to recording.  CAL. PEN CODE § 632(c).

[123]  If the statute silently requires a subjective expectation, Townsend testified to such.

expectation.

## V.    Conclusion

If the privacy interest at stake is the expectation that children will adhere to some unspoken code of silence, that expectation is absurd.  If, however, the interest at stake is the narrower expectation that only you and the people present have the power to record and/or repeat what was said, the calculus changes.  One can concede that words, once spoken, are no longer secret without giving up all aspects of privacy regarding those words.  The plain language of "oral communication" is meant to protect only the narrow interest in not being secretly recorded by people you have made efforts to exclude from the conversation.

As with any inquiry into the justifications for this expectation, it is a fact-intensive analysis taking into account all of the circumstances.  This case is straightforward.  Townsend exhibited an expectation that his words would not be intercepted when he spoke them in a girls' locker room assigned to his team rather than in front of a crowd in the gym. What he said was an "oral communication," and appellant's conviction should be affirmed.

# PRAYER FOR RELIEF

WHEREFORE, the State of Texas prays that the Court of Criminal Appeals reverse the judgment of the Court of Appeals.

Respectfully submitted,


__/s/ John R. Messinger_____
JOHN R. MESSINGER
Assistant State Prosecuting Attorney
Bar I.D. No. 24053705

P.O. Box 13046
Austin, Texas 78711
information@spa.texas.gov
512/463-1660 (Telephone)
512/463-5724 (Fax)

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that according to the WordPerfect word count tool this document contains 10,273 words.

/s/ John R. Messinger
John R. Messinger
Assistant State Prosecuting Attorney

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 21st day of December, 2015, a true and correct copy of the State's Brief on the Merits has been eFiled or e-mailed to the following:

Andrea R. Simmons
1450 East McKinney
Denton, Texas 76209
Andrea.Simmons@dentoncounty.com

Bruce Anton
2311 Cedar Springs, Suite 250
Dallas, Texas 75201
ba@sualaw.com

/s/ John R. Messinger
John R. Messinger
Assistant State Prosecuting Attorney

37

# APPENDIX

H.B. 360 by Bock

## BILL ANALYSIS

### Background Information

In 1968 Congress passed Title III of the Omnibus Crime Control and Safe Streets Act which governs the use of electronic surveillance, i.e., wiretapping and bugging.

When Title III was enacted there were several conflicting views on any legislation regulating electronic surveillance. Those who felt that abuses were inherent in any use of electronic surveillance believed that a total ban on electronic surveillance was necessary for the protection of individual privacy. Advocates of strong law enforcement felt that a broad based statute was necessary with few limits in order to provide what they claimed to be a vital crime fighting tool.

Title III was enacted as a compromise of these opposing views. It permits the use of court-authorized electronic surveillance by law enforcement officers in the investigation of certain enumerated crimes under procedures designed to afford a degree of protection of individual privacy. Title III banned completely the use of electronic surveillance by private individuals without the consent of any of the parties to the conversation.

Under Title III, states must enact specific legislation if they desire to implement the authority granted in the Act to conduct electronic surveillance. The legislative history of Title III clearly indicates that Congress intended to permit state electronic surveillance laws to be more restrictive than the Federal Act, and therefore more protective of individual privacy, but state enactments cannot be less restrictive. Nor can they expand the use of electronic surveillance beyond the perimeters established by Title III.

There are presently 25 states and the District of Columbia which have electronic surveillance statutes. All of these statutes are patterned after the Federal Act.

### What the Bill Proposes to Do

The bill creates new law by adding a new Article 18.20 to the Texas C.C.P. relating to the use of electronic surveillance as a law enforcement tool. The bill generally follows the provisions of Title III except for provisions which limit the use of electronic surveillance to narcotics cases, provisions for the designation of a judge from each administrative judicial district to rule on applications, provisions relating to applying authorities and provisions defining the role of the Texas Department of Public Safety as the only agency in implementing any electronic surveillance.

### Section by Section Analysis

Section 1. Creates a new Article 18.20, T.C.C.P. with the following provisions:

Sec. 1. Definition Section

Sec. 2. Intercepted communications and evidence derived in violation of this Act shall be inadmissible in any legal proceeding.

Sec. 3. Provides for the designation by the presiding judge of the Court of Criminal Appeals of one district judge from each administrative judicial district to hear applications for electronic surveillance within that district. If the designated judge is unable to act, then the designated judge from the adjacent district may act.

Sec. 4. Provides that electronic surveillance may be authorized only for felony violations of the Controlled Substances Act or the Dangerous Drug Act. Possession of marijuana is excluded from the application of the bill.

Sec. 5. Provides that the Texas Department of Public Safety be the primary agency relative to the possession, installation, operation or monitoring of any electronic surveillance device. The director of D.P.S. would be required to designate in writing those D.P.S. officers responsible for conducting the above operations. Other law enforcement officers would be allowed to assist D.P.S. only in the operation and monitoring of an electronic surveillance order.

Sec. 6 (a)  The Director of D.P.S. may request in writing for a prosecutor to apply for an order authorizing a wire or oral intercept.

(b)  Local law enforcement agencies may request a prosecutor to apply for a wire or oral intercept but only after the Director of D.P.S. has made certain findings in writing that such an intercept is proper.

Sec. 7 (a) (b) (c).  Provides for the disclosure and use of intercepted communications when said interceptions are made in accordance with this Act.

(d)  Under this section privileged communications retain their privileged character.

(e)  The section further provides for the use and disclosure of evidence of offenses other than those specified in the authorization order if the initial interception is found to be in accordance with the Act and a subsequent order is granted by the judge of competent jurisdiction.

Sec. 8 (a).  Provides that each application for interception authorization must be in writing and under oath and shall include:
(1)  Identity of the applicants
(2)  A full and complete statement of facts to justify a need for the order including details of the offense, a description of the place where the communication is to be seized, a description of the conversation, and the identity of the person, if known, whose communication is to be seized
(3)  A full and complete statement of other procedures tried or if not tried why said procedures are unlikely to succeed or are dangerous
(4)  A statement of the period of time for which the interception is required to be maintained
(5)  A statement whether or not a covert entry is necessary and if so, the underlying facts why such an entry is required
(6)  A full and complete statement of facts relative to prior applications
(7)  Justification for any extension, if applicable.

(b)  The judge may also require ex parte additional testimony or evidence in support of an application; and such testimony or documentary evidence shall be preserved as part of the application.

Sec. 9 (a).  Provides that in order to approve an application the judge must find on the basis of the application that:
(1)  There is probable cause for belief that an individual is committing, has committed, or is about to commit an offense enumerated in Sec. 4 (narcotics)
(2)  There is probable cause to believe that communications concerning said offense will be obtained
(3)  Normal investigative procedures have failed or appear unlikely to succeed or are too dangerous
(4)  There is probable cause to believe that the facilities in question are actually being used by the target person listed in the application
(5)  A covert entry is or is not necessary to properly and safely install the wiretapping or electronic surveillance or eavesdropping equipment.

(b)  Each order authorizing or approving the interception of any wire or oral communication shall specify:
(1)  The identity of the person, if known, to be intercepted
(2)  The nature and location of the facilities to be tapped
(3)  A description of the type of communication to be intercepted and the offense to which it relates
(4)  The identity of the authorized officer and prosecutor
(5)  The time period of the authorization (and whether or not an extension might be needed)
(6)  Whether or not a covert entry or surreptitious entry is necessary to properly and safely install wiretapping, electronic surveillance or eavesdropping equipment.

(c)  Upon request of the applicant the judge may order communication common carriers and other persons to provide certain assistance in implementing an order.  Compensation is provided for said services.

(d)  Every order and extension must contain a provision that the authorization to intercept shall be executed as soon as practicable along with a provision that the intercept be conducted in such a way as to minimize the interception of communications not otherwise subject to interception.  An extension may be granted after an application is made pursuant to Section 8 of this Article for a period of up to 30 days.  All orders and extensions must cease once the authorized objective is obtained or 30 days expire.

(e)  The judge may also require reports to be submitted showing what progress has been made.

Sec. 10 (a).  The recording of intercepted wire or oral communications is required under this section and shall be done in such a way as to protect the tapes from editing and alteration.

(b)  Provides procedures for the sealing, preservation and retention of recorded communications for a ten (10) year period after the intercept.  Custody of these communications by the judge is required and may only be destroyed upon the order of a judge of competent jurisdiction.  It is mandatory that the recordings be sealed.

(c)  Provisions are made for duplication of recordings.

(d)  The presence of the seal is a prerequisite for use or disclosure of the intercept unless a satisfactory explanation of its absence is shown.

Sec. 11.  Provides that the judge of competent jurisdiction shall seal each application made and order granted.  The application or order may be disclosed only by the judge of competent jurisdiction and may not be destroyed for at least 10 years and then only upon order of the judge of competent jurisdiction.

Sec. 12.  Provides for contempt penalty for violation of Sections 10 and 11.

Sec. 13 (a).  Provides for notice to intercepted parties not later than 90 days after the application is granted or denied.  The notice would essentially apprise the tapped party of the fact that his communications had been intercepted.

(b)  The judge could also allow inspection of recorded communications if he so chooses, in the interest of justice.

(c)  Notice may be delayed upon an exparte showing of good cause.

Sec. 14 (a).  Provides for at least 10 days notice of the interception application and order to all parties prior to the use of any communication as evidence.  This provision may be waived in some instances by the judge.

(b)  The section further provides for a hearing on a motion to suppress intercepted communications.  An aggrieved person may have intercepted communications suppressed as evidence if he shows that:
    (1)  the communication was unlawfully intercepted
    (2)  the order was insufficient
    (3)  the interception was not made in conformity with the order.

(c)  A person identified on a recording may move to suppress under subdivision (b) of this section or when his identification in court would cause harm to him exceeding the value of the identification to the prosecution.

(d)  A motion for suppression must be made before the trial and shall be in camera, if requested, and the judge may allow inspection of intercepted communications at his discretion.

Sec. 15.  Provides for the filing of detailed reports on each electronic surveillance order.  Reports contain particulars of all aspects of an order and are to be forwarded to the Administrative Office of the United States Courts.  Copies of all reports would be forwarded to the Governor, Lieutenant Governor, Speaker of the House and the Chairmen of the Senate and House committees having jurisdiction.

Sec. 16 (a)  Provides for recovery of civil damages for acts in violation of this Act:
    (1)  $100 per day or $1,000 whichever is higher, as liquidated damages
    (2)  punitive damages
    (3)  attorney's fees and costs.

(b)  A good faith reliance on a court order or legislative authorization constitutes a complete defense to any civil or criminal action brought under this Article.

Sec. 17. Provides exceptions to Section 16 for employees, officers or agents of a communication common carrier. Consensual recordings and interceptions are also excepted.

Section 2. Creates a new Section 16.02, Texas Penal Code with the following provisions:

(a) Definitions

(b) Provides a penal sanction for the interception and/or disclosure of wire or oral communications outside the scope of this Act.

(c) Provides that it is an exception to the penal violation if the intercept is made by:

  (1) Communications common carriers' employees in the normal course of their duties

  (2) Communications common carriers' employees relative to a valid order

  (3) Consensual surveillance.

(d) Provides for third degree felony sanction for the manufacture, assembly, possession, sale, or delivery of devices designed primarily for non-consensual interception of wire or oral communications outside the scope of this Act.

(e) Provides for certain exceptions to this offense.

(f) Provides that this offense is a third degree felony.

(g) Devices possessed in violation of this Article may be seized pursuant to a lawful search.

(h) Forfeiture of seized devices to D.P.S. is provided.

Section 3. The title to Chapter 16, Texas Penal Code is amended to read:
CHAPTER 16. CRIMINAL INSTRUMENTS AND INTERCEPTION OF WIRE OR ORAL COMMUNICATION

Section 4. Provides that conviction of an offense under Section 16.02, Penal Code, shall disqualify a person seeking certification by the Commission on Law Enforcement Officers Standards and Education. Persons who are already certified shall have their certification revoked.

Section 5. Emergency Clause.

Rulemaking Authority

It is the committee's opinion that this bill does not delegate rulemaking authority to a state officer, agency, department or institution.

Summary of Committee Action:

The bill was presented in public hearing on February 25, 1981, and was referred to subcommittee. The subcommittee met on April 9, 1981. The bill was reported favorably from the full committee in formal meeting as substituted, on April 14, 1981, by a vote of 7 ayes, 3 nays, 0 present not voting, and 1 absent.

Comparison of Bill as Introduced and the Substitute:

The substitute contains language which requires that covert entry be provided for in the application and the court authorization. Covert entry is implicitly allowed in the original bill by virtue of case law.

The substitute provides that the Director of D.P.S. forward a report reflecting all completed orders to the Governor, Lieutenant Governor, Speaker of the House and the Chairmen of the House and Senate Committees having jurisdiction. Such reporting is not provided for in the original bill.

The substitute provides that D.P.S. personnel may be assisted by local law enforcement personnel only in the operation and monitoring of interceptions. The original bill did not limit assistance to only operation and monitoring.

The substitute provides that a person convicted of an offense of unlawful interception, use, or disclosure of wire or oral communication is disqualified from being commissioned as a peace officer. Conviction would cause an already commissioned officer to be decertified. The original bill contained no such provision.

The substitute provides that any additional testimony or documentary evidence ordered by the judge must be preserved as part of the application. This provision is not contained in the original bill.

The substitute provides that all intercepted persons must be notified as to said interception. The original bill provided that the judge had discretion as to notification.

The substitute provides that all interceptions must be recorded. The original bill provided that a recording would be made, if possible.

The substitute provides that an intercepted person may move to suppress the contents of a communication on the grounds that the harm resulting from his identification in court exceeds the value to the prosecution of the disclosure of the contents. This is a new provision.

tice in 1961 had by 1966 raised the number of federally secured convictions in the area of organized crime from 73 to 477. Yet against the hard-core little real progress was made. The estimated number of members of the leading groups today is put at 5,000. During the 1961–66 period, only 185 of these individuals were indicted and 102 convicted. Six gained acquittals and dismissals and four secured reversals. A conviction rate of 5 percent per 5-year period hardly constitutes more than a harassing action. The effect is negligible.

Organized criminals must hold meetings to lay plans. Where the geographical area over which they operate is large, they must use telephones. Wiretapping and electronic surveillance techniques can intercept these wire and oral communications. This is not, however, the whole situation. More than the securing of an evidentiary substitute for live testimony, which is not subject to being eliminated or tampered with by fear or favor, is necessary. To realize the potential possible from the use of criminal sanctions, it will be necessary to commit to the system more than legal tools. Time, talent, and personnel are required. Nevertheless, no amount of time, talent, or personnel—without the necessary legal tools—will work, and authorized wiretapping and electronic surveillance techniques by law enforcement officials are indispensable legal tools.

Debate over the constitutionality of wiretapping and electronic surveillance techniques has raged insistently since the Court decided in 1928 in *Olmstead v. United States,* 48 S.Ct. 564, 277 U.S. 438 (1928), that wiretapping accomplished without a physical trespass into a constitutionally protected area did not violate any provision of the Constitution. That debate has taken many forms. It has posited many hypotheses. All of them need not now be considered, for the Court itself now has authoritatively set down the constitutional standards in this area on the use of these techniques in *Berger v. New York,* 87 S.Ct. 1873, 388 U.S. 41 (1967), and *Katz v. United States,* 88 S.Ct. 507, 389 U.S. 347 (1967).

The *Berger* decision reversed by a vote of 6 to 3 the conviction, secured through a court-ordered eavesdrop, of a New York public relations man for conspiracy to bribe the chairman of the New York State Liquor Authority. In declaring the New York State eavesdropping statute unconstitutional, the Court held that (1) a conversation is within the fourth amendment's right to privacy protections, and the use of electronic devices to seize conversations is a search within the meaning of that amendment; (2) the language of the New York statute was so broad that it resulted in a trespassory intrusion into a constitutionally portected area and is violative of the fourth and 14th amendments; and (3) evidence obtained by an eavesdrop which violates the fourth amendment must be excluded in State courts.

During the course of the majority opinion the Court delineated the following constitutional standards the New York statute failed to meet:

(1) Particularity in describing the place to be searched and the person or thing to be seized.

(2) Particularity in describing the crime that has been, is being, or is about to be committed.

(3) Particularity in describing the type of conversation sought.

(4) Limitations on the officer executing the eavesdrop order which would (a) prevent his searching unauthorized areas, and (b) prevent further searching once the property sought is found.

(5) Probable cause in seeking to renew the eavesdrop order.

(6) Dispatch in executing the eavesdrop order.

(7) Requirement that the executing officer make a return on the eavesdrop order showing what was seized.

(8) A showing of exigent circumstances in order to overcome the defect of not giving prior notice.

The *Katz* decision, handed down 6 months after *Berger*, reaffirmed the principles and constitutional guidelines set out in *Berger*. In *Katz* petitioner was convicted of interstate transmission of wagering information via telephone in violation of a Federal statute (18 U.S.C. 1084). At trial the Government introduced, over petitioner's objection, evidence of his end of telephone conversations, overheard by FBI agents who had attached an electronic listening and recording device to the outside of the public telephone booth from which he had placed his calls.

On certiorari the Supreme Court held that the Government's activities in electronically listening to and recording petitioner's words constituted an unlawful search and seizure within the fourth amendment and reversed the conviction.

The Court noted that the Government handled the surveillance in the following manner: (1) The agents did not begin their electronic surveillance until investigation of the petitioner's activities had established a strong probability that he was using the telephone in question to transmit gambling information interstate, in violation of Federal law; (2) the surveillance was limited, both in scope and duration, to the specific purpose of establishing the contents of petitioner's unlawful telephonic comunications; (3) the agents confined their surveillance to the brief periods during which petitioner used the telephone booth and took great care to overhear only the conversations of the petitioner himself.

Commenting on the manner in which the surveillance was carried out, the Court stated, "It is clear that this surveillance was so narrowly circumscribed that a duly authorized magistrate, properly notified of the need for such investigation, specifically informed of the basis on which it was to proceed, and clearly apprised of the precise intrusion it would entail, could constitutionally have authorized, with appropriate safeguards, the very limited search the Government asserts took place."

The Court noted that the agents had acted with restraint, but that the restraint was imposed by the agents themselves, not by a judicial officer. The agents were not required, before starting the search, to do the following things: (1) present their estimate of probable cause for detached scrutiny by a neutral magistrate; (2) conduct the search within precise limits established by a specific court order; (3) to notify the authorizing magistrate, after the search, of all that had been seized.

In concluding, the Court held that the Government agents ignored the procedure of antecedent justification that is central to the fourth amendment, and a procedure the Court held to be a constitutional pre-condition of the kind of electronic surveillance involved in this case.

Working from the hypothesis that any wiretapping and electronic surveillance legislation should include the above constitutional standards, the subcommittee has used the *Berger* and *Katz* decisions as a guide in drafting title III. Each section of title III is discussed in detail in the analysis section of this title, including those provisions which are intended to conform to the *Berger* and *Katz* decisions.

Legislation meeting the constitutional standards set out in the decisions, and granting law enforcement officers the authority to tap telephone wires and install electronic surveillance devices in the investigation of major crimes and upon obtaining a court order, which is the purpose of title III of S. 917, has been endorsed by the following groups and organizations:

(1) The President's Commission on Law Enforcement and Administration of Justice.

(2) The Judicial Conference of the United States.

(3) National Association of Attorneys General.

(4) National District Attorneys Association.

(5) Association of Federal Investigators.

(6) All living former U.S. attorneys for the southern district of New York.

(7) The National Council on Crime and Delinquency.

In addition to the above endorsements, the subcommittee received comments on wiretapping and electronic surveillance legislation from many State and Federal judges and law enforcement officials, officials of State and local crime commissions, the attorneys general of the States, local prosecuting attorneys, and other interested and qualified persons. These statements favored almost without exception legislation granting carefully circumscribed authority to law enforcement officials to engage in wiretapping and electronic surveillance in the investigation of certain serious crimes after obtaining a court order. These statements are available for reference in the subcommittee's offices.

It also should be pointed out that every U.S. Attorney General since 1931, excepting the present Attorney General, has endorsed some sort of legislation granting law enforcement officers the right to utilize wiretapping and/or electronic surveillance devices in the investigation of major crimes upon the securing of a court order.

## TITLE IV—STATE FIREARMS CONTROL ASSISTANCE

According to FBI figures, in 1966 firearms were used in 60 percent of the murders committed in the United States. Thus, 6,500 persons were killed in 1966 by persons armed with guns, a 16-percent increase over 1965.

In the category of aggravated assault by gun and robbery by gun, the percentages of increase were 25 and 14, respectively, with 43,500 citizens assaulted with firearms and 59,000 Americans robbed at gunpoint in 1966.

In 1967, there were further increases in these two categories of violent crime; armed robbery increased 30 percent and aggravated assault by gun increased 22 percent.

# LEGISLATIVE HISTORY

Section 2510 of the new chapter contains the definitions of certain words employed in the proposed new chapter.

Paragraph (1) defines "wire communication" to include all communications carried by a common carrier, in whole or in part, through our Nation's communications network. The coverage is intended to be comprehensive.

Paragraph (2) defines "oral communication" to include any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation. The definition is intended to reflect existing law. See *Katz v. United States*, 88 S.Ct. 507, 389 U.S. 347 (1967). Compare *United States v. South Eastern Underwriters Assn.*, 64 S.Ct. 1162, 322 U.S. 533 (1944) with *Lee v. Florida*, 191 So.2d 84 (1966), *certiorari granted*, Jan. 15, 1968, No. 174, 1967 Term. The person's subjective intent or the place where the communication is uttered is not necessarily the controlling factor. Compare *Linnell v. Linnell*, 143 N.E. 813 (Mass. 1924), with *Freeman v. Freeman*, 130 N.E. 220 (Mass. 1921). Nevertheless, such an expectation would clearly be unjustified in certain areas; for example, a jail cell (*Lanza v. New York*, 82 S.Ct. 1218, 370 U.S. 139 (1962)) or an open field (*Hester v. United States*, 44 S.Ct. 445, 265 U.S. 57 (1924)). Ordinarily, however, a person would be justified in relying on such expectation when he was in his home (*Silverman v. United States*, 81 S.Ct. 679, 365 U.S. 505 (1961)) or office (*Berger v. New York*, 87 S.Ct. 1873, 388 U.S. 41 (1967)), but even there, his expectation under certain circumstances could be unwarranted, for example, when he speaks too loudly. See *State v. Cartwright*, 418 P.2d 822 (Ore. 1966), *certiorari denied* 87 S.Ct. 961, 386 U.S. 937 (1967). The person's expectation that his communication is or is not subject to "interception," defined in paragraph (4), discussed below, is thus to be gathered and evaluated from and in terms of all the facts and circumstances.

Paragraph (3) defines "State" to include the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

Paragraph (4) defines "intercept" to include the aural acquisition of the contents of any wire or oral communication by any electronic, mechanical, or other device. Other forms of surveillance are not within the proposed legislation. See *Lee v. United States*, 47 S.Ct. 746, 274 U.S. 559 (1927); *Corngold v. United States*, 367 F.2d (9th 1966). An examination of telephone company records by law enforcement agents in the regular course of their duties would be lawful because it would not be an "interception." (*United States v. Russo*, 250 F.Supp. 55 (E.D.Pa.1966)). The proposed legislation is not designed to prevent the tracing of phone calls. The use of a "pen register," for example, would be permissible. But see *United States v. Dote*, 371 F.2d 176 (7th 1966). The proposed legislation is intended to protect the privacy of the communication itself and not the means of communication.

Paragraph (5) defines "electronic, mechanical, or other device" to include any device which can be used to intercept wire or oral communications. Only equipment furnished to a subscriber by a communications common carrier in the ordinary course of its business, and being used by the subscriber